THE STATE v. KAISER et al., *Appellants.*

Division Two, November 20, 1894.

1. **Appellate Practice:** INSTRUCTIONS: MOTION FOR NEW TRIAL. Where no error is assigned, in the motion for a new trial, upon the giving of the instructions, they are not reviewable on appeal.

2. **Criminal Practice:** SEVERAL DEFENDANTS: VERDICT. Where three defendants are jointly indicted and tried for murder, it is competent for the jury to convict two and acquit the third.

3. ———: EVIDENCE: RES GESTÆ. Exclamation of an eyewitness of a murder *held* admissible as part of the *res gestæ.*

State v. Kaiser.

4. ———: ———: IDENTIFICATION OF PERSON. Evidence of a witness, that he was convinced by a woman's manner of identifying him from among a crowd that she was the woman he met on the night of the homicide and as to the facts of such identification, *held* admissible under the circumstances of this case.

5. ———: IMPROPER REMARKS OF COUNSEL: HARMLESS ERROR. Where on the trial of a criminal case, counsel for the state misstates the evidence, but is corrected by the court and such correction is acquiesced in, there is no ground for reversal.

*Appeal from St. Louis Criminal Court.*—HON. H. L. EDMUNDS, Judge.

AFFIRMED.

*Chester H. Krum* and *Andrew Duggan* for appellants.

(1) The verdict is so inconsistent, in view of the evidence on the part of the state, that it ought not to have been permitted to stand. It can only be explained upon the theory of passion or prejudice against the defendants who were found guilty. That a verdict based upon prejudice or passion, or one against which the evidence strongly preponderates, will not be permitted to stand, is a most familiar proposition in this state. *Hipsley v. Railroad*, 88 Mo. 348; *Spohn v. Railroad*, 87 Mo. 74; *St. Louis v. Lannigan*, 97 Mo. 75; *Garrett v. Greenwell*, 92 Mo. 120; *Whitsett v. Ransom*, 79 Mo. 258. (2) The evidence of the witness Von Phul as to a remark made to him by the Bogines woman on the night of the murder, admitted in rebuttal, was clearly incompetent. This evidence was introduced on the theory that it corroborated the witness Bogines. It related to a material feature of the case. Its admission was erroneous. *State v. Day*, 100 Mo. 248; *State v. Walker*, 78 Mo. 388; *State v. Brown*, 64 Mo. 371; *Howell v.*

*Howell*, 37 Mo. 124; *Brown v. Mooers*, 6 Gray, 451; *Anderson v. Railroad*, 54 N. Y. 334; *Lane v. Bryant*, 9 Gray, 245; *Railroad v. Van Steinburg*, 17 Mich. 99; *Williams v. Kelsey*, 6 Ga. 365; *Allen v. Denstone*, 8 C. & P. 760. (3) Even more clearly erroneous than the action of the court in regard to the statement said to have been made by the Bogines woman on the night of the murder, was the admission of the evidence of Von Phul as to what occurred between himself and that woman at the police station after the murder and the arrest of the defendants. *State v. Woolard*, 111 Mo. 255; *State v. Mahly*, 68 Mo. 319; *State v. Forsythe*, 89 Mo. 672; *State v. Kring*, 64 Mo. 595; *State v. Reilly*, 4 Mo. App. 394; *State v. Ramsey*, 82 Mo. 139; *State v. Underwood*, 77 N. C. 502; *State v. Smith*, 75 N. C. 306; *Ferguson v. State*, 49 Ind. 33.

*R. F. Walker*, Attorney General, *C. O. Bishop* and *M. F. McDonald* for the state.

(1) The instructions given by the court are not open to review here. Although excepted to, no complaint is made of them in the motion for new trial. *State v. Nelson*, 101 Mo. 477. (2) The court did not err in admitting the testimony of Von Phul in rebuttal. 3 Rice's Evidence (Criminal), sec. 105; 1 Wharton's Law of Evidence, sec. 571; Harris on Identification, sec. 7. Pertinent evidence may be received at any time. The order in which evidence may be introduced is a matter of practice, largely within the discretion of the court. *State v. Buchler*, 103 Mo. 203. (3) Cries of bystanders while the thing is being done are original and not hearsay evidence, because part of the *res gestæ*. 3 Rice's Evidence (Criminal), sec. 80. (4) The judgment should not be reversed because of the alleged improper remarks of the prosecuting attorney.

GANTT, P. J.—The defendants, Kaiser and Henze, were jointly indicted with Charles McDonnell at the March term, 1893, of the St. Louis criminal court, for the murder of Edwin E. Brown, in the city of St. Louis, on March 2, 1893. A motion to quash was overruled. The prisoners were duly arraigned at the May term, 1893, and the cause continued to the July term, at which they were jointly tried, and Kaiser and Henze convicted of murder in the first degree, and McDonnell acquitted. Motions for new trial and in arrest were duly entered and overruled, and the defendants sentenced at the November term, 1893, from which they appeal.

The testimony for the state tended to show that Edwin E. Brown was a live stock commission merchant, residing at number 3119A Morgan street, St. Louis. He had resided there since June 1, 1892. On the night of March 2, 1893 (on which day a primary election had been held), at or near 10 o'clock, he was violently assaulted by three men on Franklin avenue, near Garrison avenue (about a block and a half from his residence), and died within an hour; a valuable gold watch containing a likeness of his little dead son, was missing from his person and was never recovered. The autopsy showed that death was caused by internal hemorrhage, due to the rupture of blood vessels in the abdomen, the result of external violence. Deceased was about five feet ten inches in height, weighed two hundred and thirty pounds, and was abnormally fat in the abdominal muscles. The principal eyewitnesses of the assault were three negro women—Carrie Chapman, Betty Robinson and Annie Bogines. The former two were domestics living with families in the West end, and were returning from church in company; the latter kept furnished rooms at 873 North Eighth street,

and had been spending the evening visiting her husband, who worked for the Lindell railroad company.

There had been a drizzling rain during the afternoon and up to about 8 o'clock, but it had cleared off afterward; the streets were wet and muddy. The place where the struggle occurred was at the entrance of the driveway of Mr. Niedringhaus' residence, leading into a yard, at the rear of which was a stable, standing on Bell street; below the stable was a swinging electric light, and there was another electric light on Franklin avenue, both of which cast a strong light over the yard and avenue. The uniform testimony of the witnesses is that this double light was brilliant, and not dim. The clothes taken from the body of deceased when conveyed home were muddy; "there was a patch of mud along the right vest pocket, and down along the right leg; the patch along the abdomen looked like it might have been a kick."

The testimony of Carrie Chapman was that she and Bettie Robinson were going west on Franklin avenue; they heard a noise and saw three men meet one man, "and that they all got into a huddle together, and they stopped and said something, * * * and the three commenced pounding the man they met, saying something to him, hitting, jerked him around and hit him, and one of them got him by the neck and choked him, * * * and he kind of made a funny noise (a guttural sound), and then they struck him and he fell to the pavement; * * * when they got to the drive they throwed him off after they got him in the drive, * * * and one, the big man (identified by her as defendant Kaiser), got on him with his knee. * * * They were trying to go through him all the time—trying to go through his pockets; * * * I was right in the middle of where there is a vacant place; there is a curb comes up—I was stand-

ing there leaning on my umbrella; I wasn't but a little piece away;  *  *  *  I seen them trying to go through his pockets. After a while two of them ran off, and then the big, tall one (Kaiser) stood on him with his knees,  *  *  *  on his stomach;  *  *  *  the man couldn't holler—only made a funny noise.  *  *  * The two that first ran off told him to come on, that the cops would be there directly, so he jumped off and ran. Instead of running across where they did, he jumped up the carriage drive and then turned around and ran a step or two on the pavement, and shot off toward Garrison avenue and Morgan, and the man was still down. The man who was last on him ran across Franklin avenue, and one of the electric cars got in front of him; he ran behind the car.  *  *  * The tallest man (Kaiser) had him by the throat with one hand, and he was on him with his knee, and was trying to go through his pockets; he was trying to get him to give something up, and the others, because he wouldn't give it up, were hitting him; they were all going through his pockets; I don't know what was said there, only I could hear them talking and asking him to give something up, and he wouldn't give it up; and when he wouldn't give it up they just kept punching him; they had him so tight he couldn't holler at all; I got a good look at the three men; *them is the very three* (pointing out the three defendants on trial). I have not one bit of doubt about it. After they ran away Mr. Brown tried to get up; he was so weak he couldn't hardly get his hand up, and then he fell and said: 'O, them scoundrels is got my watch with my dead boy's picture in it!' and then he hollered just as loud as he could holler, 'Police!' By this time there was a little crowd got on down, and there was two men raised him up,  *  *  *  and I went home.  *  *  * I got a good look at their faces, and I saw them at the

station house afterwards and identified them as the same ones. * * * The light was good; there are trees there, but there were no leaves on them; * * * the two electric lights shone straight across the yard."

Betty Robinson gave evidence that she was with the preceding witness, walking at their usual gait, until they reached Niedringhaus' place. "I looked up and saw these men—there were four; it seems that they had just stopped a little this side of the steps, and they commenced tusseling, and then the man commenced making a noise like he was choked, and they were chunking him and beating him, hitting him and pulling at him. I went over to the other side of the street. When they got to the drive they knocked him almost down, and then they pushed him and got him against a post there; they seemed to be all of them over him, and I couldn't see just what they were doing; they were talking to him, saying something, but I couldn't say what it was; the man was going 'oh! oh! oh!' he couldn't holler distinct; he was just like anybody can't holler if they are choked; * * * he didn't seem like he could say anything; * * * they broke and run, and the tallest one (Kaiser) he kind of run over toward me, and then he ran up, and the car kind of cut him off, and he crossed over near me; I couldn't say whether the other two defendants are the other two men; couldn't see them distinctly; they look like the men; * * * I got a good look at the man that crossed over near me; *  * * *the electric light was very bright, light enough for me to distinguish a man's features; I got a good look at him; * * * when he started to go across the street to go behind the car, the light was shining right in his face."

The other negro woman, Annie Bogines testified subsequently as follows: "I was walking on the street

(Franklin avenue). I noticed in front of me two colored women, and one white gentleman walking just a little piece ahead of them. In a few moments I saw the gentlemen coming across Franklin avenue on Gårrison, 'cross over on Garrison, and turned down like they was facing me. In a moment's time they passed Niedringhaus' front door; they met this man that was in front of the colored women, and one of them mentioned money—'money or life.' They commenced a tight scrimmage right there. So this man sitting right there *(Henze) he fired off and struck Mr. Brown over the eye.* There was something shined, or bright in his hand. I couldn't say whether it was a knife or a razor. They all grabbed him. Mr. Brown started to fall, and Kaiser grabbed him by the throat with his left hand. Mr. Brown gurgled—made a curious noise. They all grabbed him, and in the scramble struck him (I couldn't say which one was hitting him), until they got him into the private drive. Charley, there (defendant McDonnell) then let go of the scrimmage and went out on the sidewalk and looked around. I heard him called 'Charley' that night. He stepped out into the street a little piece and looked up and down the street, and that young man there (Henze) kept his hand on his throat and they kept beating him and kicking him, and they kept searching his pockets. I walked up there to the pillar of the drive and leaned over it to see if it was Mr. Niedringhaus, or else I wouldn't have meddled with it. Charley says to me, 'get away from here.' 'What do you damned niggers want here, raising an excitement?' 'It is only a friend of ours, and we are trying to get him away from the collars.' I says, 'It is no such thing; that man there knock him down; I seen something shining in his hand.' He then spoke up to me and says to Charley: "If you can't get them damn nigger bitches out of there I will. You attend to this

and I'll get them away from here.' That man there
(Henze) rushed his hand down Mr. Brown's vest pocket
and pulled out something, and after he got it he said to
this one here (McDonnell), 'Charley, come on, let's go,
the collars will have us in a minute. Come, and let's
go.'

"The cable car was coming up Franklin avenue to
Garrison, and the two (Henze and McDonnell) made
across the car catacornered, and rushed to the corner
on the other side; that left Kaiser by himself, and he
made two or three searches around through the man's
pockets and around his body, then he made up toward
the stable, three or four steps, wheeled and came right
back, and that threw him immediately on the car, and
as he run up behind the car, I hurried up and rushed
into Mr. Von Phul's arms and hollered. I thought he
(Kaiser) was going to strike me; I said to Mr. Von
Phul (as near as I can remember), 'Those three men
are beating this man to death; if I could get a police-
man I would have them arrested.' (There was no
objection to this testimony.) When Kaiser kicked
Mr. Brown the last time, the sound of it was enough to
scare one to death; *he kicked him down low in the stom-
ach, and the sound was like a slosh of water;* like a slop-
barrel on a wagon going along; I saw Mr. Von Phul
there just after, and Mr. Stark and another gentleman
with him smoking; there were two electric lights, *and I
know there was light enough for anyone to look into any-
one's face and know who it was;* it had been raining that
evening about 8 o'clock, a drizzle rain, but it was not
raining at the time Mr. Brown was murdered. I saw
two colored women there, one was looking over; the
dark one leaned on her parasol peeping over (the stone
coping); the light colored one stood across the street
and kept hollering for the other one to 'come on.'"

On cross-examination:—"I was in the chief of police's office afterward when five men were present, including the three defendants; I picked out Kaiser immediately, then I picked out the big one (Henze), and then all three of them; the last one to leave was Kaiser, he kicked Mr. Brown before he left the body; after he had dragged and searched him, he gave him a farewell kick."

Re-examined:—"*I met Mr. Von Phul in the police office, and there I recognized him as the gentleman I had ran into; I had never seen him until that night;* I also saw in the office the two women I had seen that night; also Mr. Stark."

Mr. Frederick Von Phul testified: "I am one of the city assessors; had been to the polls that night, left about 9:30; was walking east on Franklin avenue on the south side (the assault was on the north side); near Garrison avenue heard the cry of 'watch!' and quickened my steps to where I saw deceased; before I got there I met three men, crossing at different angles from me, Indian file, fifteen to twenty feet apart, the two small ones in front and the taller man behind; I was within twenty-five feet of them; I heard the second man holler 'come on!' the middle man halted and called to the taller man behind. When I reached Mr. Brown, two gentlemen were there, I think assisting him; one of them was Mr. Stark; on the way I met a negro woman who spoke to me." (On objection of appellants, witness was not permitted to state what she said to him.)

Mr. Roland M. Stark testified that he and a friend of his named Smith were standing on the corner waiting for a car; "I happened to look down the street and saw a kind of scuffle going on; I went right down there, as far as Niedringhaus' driveway; I saw three men run off, two of them ran straight across the

street, and one ran toward the car track and toward me and toward the sidewalk, and from there he went straight on up toward Garrison avenue; he went half way into the middle of the car track and then kind of come back toward the pavement, toward me, and ran straight up; there was a car coming along at the time, going west, and another coming down east; I didn't notice whether he went in front or behind the latter car; I was about two feet from this man; the electric light was back of me, as I turned around; I thought he was going to strike me, or something, or ask me what it was my business coming down there; I had a side look at his face; he was a man about six feet high, and wore a stiff hat; had on a cutaway coat; I could not swear that either of these defendants is that man, *but there is one that resembles him in the light coat (this was Kaiser);* then I heard Mr. Brown call 'Police!' and I turned and saw him for the first time; he was staggering up to the drive and I caught him just as he fell against the terrace; he said they had beat him and knocked him down and stamped on him and got his watch with his boy's photograph enameled in it. Another gentleman came up and Smith and I took Mr. Brown home; his right eye was all swollen up and blue; he died in about half an hour after we got him home; I didn't see any colored women there, but they might have been there without my seeing them; the first time I saw Kaiser was in the police station when they had me go down there and identify him. *I saw Henze at the station on Seventh and Carr.*"

Mr. Von Dillon testified that he heard the cry of police from his residence near by, looked out and saw three parties run across from the driveway and dash away; went down to the place and *observed across the street two colored women coming up;* they walked across the street, and he saw no more of them; when he got

to Mr. Brown he heard him say, "they got my watch," and Mr. Stark and Mr. Smith took him home. "There were five persons present at the time—Mr. Von Phul, Mr. Stark, Mr. Smith, myself and a gentleman who lived next door."

Ida Beardon testified that she was an inmate of a "sporting house;" that she had known Henze about nine months; that he visited constantly another inmate of the house, named Essie Davis. "On Tuesday night, March 2, Henze came to the house in a carriage driven by his brother, and staid about half an hour; it was between 7 and 8 o'clock; they drove away; Henze came back between 12 and 1 to see Essie; when he came in he was real dirty; his feet were all muddy, as well as his pants, and his hands were all dirty, like he had fallen down. Essie said to him, 'Look like you have been fighting with some colored woman.' He said, 'No, we done up a man, and I came damn near getting done up myself.' He staid there all night, till half past 6 in the morning. He cleaned his clothes and went out. His whole pants in front were all muddy, and his coat sleeves were all muddy. He came back about half past 6 or 7 o'clock the next evening. *I heard a conversation between him and Essie in the next room. Essie said, 'That man is dead.' He said, 'Yes, I know he is dead; it wasn't for the watch we killed the man, but for the two hundred dollars.'*"

This was substantially the state's case.

The defendants did not testify in their own behalf, but endeavored to establish that the negro women were not at the scene of the homicide.

Karl Von Valkenberg testified he had been in this country nearly three years, and was by occupation "a military man" and on the night in question he was in the neighborhood in which the homicide was committed

and heard the cry of "Police, police," and started to Mr. Brown and saw three men running away. He saw two men help Mr. Brown up, Mr. Stark and Mr. Smith, but he saw no negro women around there, nor did he see Mr. Von Phul, nor Von Dillon.

George W. Dashman testified he was on the car, saw Mr. Brown staggering, saw men run to him and got off the car and went to him. Saw no negro women and could not recognize any of the other gentlemen who were there.

Defendants also offered evidence tending to prove an *alibi* for Kaiser and Henze.

A brother of Henze's testified that he drove the appellant, Henze, in a carriage fron the "sporting house" above mentioned about 8:15 o'clock down town to a saloon, where they took in a woman; went around to half a dozen different places, and were together for an hour and a half or three quarters; that he left his brother on Sixth and Elm; returned to the stable about a quarter to 10, and then took some of the election judges with the ballot boxes and an officer to the city hall, in the same carriage. This was contradicted by the judges and the officer, who testified that they were at the stable when the 9 o'clock bell rang; the carriage was there ready, but they waited fifteen or twenty minutes for Henze, the driver, who drove them to the city hall, waited for them there, and drove them back up town.

There was other testimony to prove an *alibi* for both Kaiser and Henze, and Essie Davis contradicted the statements of Ida Beardon.

The state in rebuttal recalled Mr. Von Phul and propounded to him this question: "Did you meet anyone between the space of Niedringhaus' residence and the driveway?" To which the defendants objected and the objection was overruled. The witness then answered that he met a woman. He was then asked

what she said.    To this defendants objected and
the objection was overruled and the witness answered
that she said, "Hurry up, they have about killed that
man." He did not know the woman at the time, but
found out afterward that it was the witness, Annie
Bogines; that he knew she was the same woman,
because when he met her at the office of the chief of
police a few days afterward, she accosted him, described
his dress that night, and repeated to him the very
remark above stated.

The defendants did not testify in their own behalf,
and at the close of the case, asked the following instruc-
tion: "The court charges the jury that unless they are
satisfied from the evidence, beyond a reasonable doubt,
that all the defendants were present and were partici-
pating in the robbery and murder of the deceased,
then neither of the defendants can be found guilty.    If
the jury believe that any one of the defendants has not
been shown to have so participated, all of the defend-
ants must be acquitted." Which was refused by the
court and an exception duly saved.

I. The court fully instructed the jury, but it is
unnecessary to incumber this opinion with the instruc-
tions.    No complaint is made of them in the motion
for a new trial and they are therefore not reviewable
here.    *State v. Gilmore*, 110 Mo. 1; *State v. Day*, 100
Mo. 242, and cases there cited.

II. The first assignment is that the court erred in
refusing the instruction asked by the defendants to the
effect that if the jury believed that any one of the
defendants had not been shown to have participated in
the robbery and murder of Edwin E. Brown then all
three of them must be acquitted, and as the jury
acquitted McDonnell and convicted Kaiser and Henze,
the judgment should be reversed and the cause
remanded.

The court most clearly did not err in refusing to give this instruction. It was the plain statutory duty of the jury to assess the punishment of each defendant, jointly tried, separately. R. S. 1889, sec. 4228.

Offenses jointly committed are several in law and an allegation that two or more committed the offense charged is but saying that each defendant committed the crime, and where two or more are thus jointly charged generally it is competent for the jury to convict one and acquit the others; the only exception being in those cases where from the very nature of the crime both defendants must necessarily be guilty or both innocent, as in fornication, criminal conspiracy and perhaps others. But there is nothing in the joint charge of murder or assault with intent to kill which necessarily requires the conviction or acquittal of all jointly charged.

In this case the *corpus delicti* was shown beyond any reasonable doubt. The question submitted to the jury was whether these defendants were the perpetrators of the murder. The burden was on the state to show to the satisfaction of the jury, beyond a reasonable doubt, that these defendants committed the crime. It might very easily happen that, owing to the hour of the night, the locality of the crime, and the small number of people on the street at that hour of night, the witnesses according to their proximity might identify one or two and not be able to identify the third man.

There is nothing illogical or unreasonable in such a result, and it may be that McDonnell was in fact guilty and the state unable to prove it beyond a reasonable doubt. If so, he was entitled to go acquit. But this would furnish no reason, whatever, for the discharge of either of the others, if the jury should believe they were identified beyond a reasonable doubt

as the murderers of Mr. Brown, nor do we concur with counsel for defendants that the proof was equally strong against all three. We think the record very clearly discloses that Kaiser, from his size, and the fact that he remained holding the deceased down with his knee on his breast, after his companions in the crime had fled, and then ran across the street and came directly under the observation of the witnesses in the glare of the electric lights, was much more positively identified than McDonnell. There were also pregnant circumstances shown against Henze that were not proven against McDonnell, and his most unsatisfactory and inconclusive attempt to show an *alibi* must have had its influence with the jury. It was the province of the jury to determine the connection of each of the defendants with this crime, and the acquittal of McDonnell affords no reason in law or logic why the other two should not be punished if found guilty by the jury. Certainly there is nothing in the evidence that smacks in the least degree of prejudice. *State v. Rambo*, 95 Mo. 462; 1 Bishop's Criminal Procedure [3 Ed.], sec. 463; 1 Bishop's New Criminal Law, sec. 800.

III.    It is urgently insisted that this cause should be reversed because Mr. Von Phul was permitted to testify, in rebuttal, to the remark made to him by the woman Bogines as he hurried to the assistance of Mr. Brown, after hearing the cry of "Watch."

Mrs. Bogines had testified in her examination in chief that, as Kaiser wheeled and came back after starting to run, she thought he was going to strike her, and she hurried up and suddenly encountered Mr. Von Phul and said to him as nearly as she could remember, *"those three men are beating this man to death."* The defendants had endeavored to impeach her testimony by showing that she was not present at the time she said she was. The state, to corroborate Mrs. Bogines,

offered Mr. Von. Phul's evidence to the effect that the woman he met that night as he went to Mr. Brown's assistance made the remark to him: "Hurry up; they have about killed this man."

When this evidence was offered, counsel for defendants inquired, "if it was in rebuttal of their case." The court replied, it didn't know until it was answered. Counsel then made the point, it was not competent evidence because he had introduced nothing on the subject. In other words, the only objection to the evidence was that it was not rebuttal. The court then permitted Mr. Von Phul to state that, as he went to the assistance of Mr. Brown, the deceased, he met a woman and she said to him: "Hurry up; they have about killed this man." Although it might not have been competent for the purpose of rebuttal, it was legitimate as a part of the *res gestæ*, and ought not to have been excluded in the first instance when offered by the state. It was an exclamation made by a person on the spot, in the presence of the assaulted man, and while the assailants were yet in sight, just leaving their victim, and when the witness who heard the exclamation, the dying man, the woman who made the exclamation and the fleeing assailants were all still in fifty feet of each other. Under such circumstances the exclamation of a bystander, made at the time of the occurrence or immediately thereafter, forms a part of the *res gestæ*. *State v. Walker*, 78 Mo. 380. The exclamation of the woman to Mr. Von Phul was clearly an undesigned incident of this cruel and unprovoked homicide; an expression of horror at the deed she felt herself powerless to avert, and an instinctive cry for help, and the language itself indicated that the crime was not yet complete and he might still aid the stricken man, and we think was competent. This case is readily dis-

tinguishable from *State v. Brown*, 64 Mo. 371. *State v. Walker*, 78 Mo. 388; *State v. Day*, 100 Mo. 242.

Being then competent as a part of the *res gestæ*, it is immaterial that the trial court assigned another ground for its admission. The order in which the evidence should be introduced was largely within the discretion of the criminal court. *State v. Buchler*, 103 Mo. 203; 3 Rice on Evidence (Criminal), secs. 105–109; Wharton's Law of Evidence, sec. 571.

IV. Again it is assigned as error that the court permitted Mr. Von Phul to state how he knew that Mrs. Bogines was the woman who met him on the night of the murder. He stated that he did not know her on the night of the homicide, but at the trial he knew that the woman he met was Mrs. Bogines. He was asked if he afterward saw the woman he met that night in the office of the chief of police, and, upon objection, he was not permitted to answer. After repeated efforts to get the witness to state how he knew Mrs. Bogines was the woman and all excluded by the court, save the statement that he knew she was the woman he saw that night, the attorney for the state turned the witness over to counsel for defendants, who again cross-examined the witness as follows:

"*Q.* How was she dressed that night, this woman? *A.* I don't know. I don't know how she was dressed.

"*Q.* You didn't see her face that night? *A.* Oh, I didn't see the face enough to recognize it afterwards; no, sir.

"*Q.* Now, if this woman hadn't picked you out and asserted that you were the man, you wouldn't have any opinion on the subject at all, would you? *A.* I would, Judge Krum; and if you would have allowed me to go on and explain, and the court would, I'd show you I couldn't help but be right.

"*Q.* Wasn't it because she picked you out that you were of the opinion that she was the woman. Just answer the question yes or no? *A.* Put it again.

"*Q.* Wasn't it because she picked you out and asserted that you were the man, that you became satisfied that you saw the woman? *A.* No, sir, it was not the way."

*Mr. Krum:* "That's all, then."

*By Mr. McDonald* (counsel for the state): "*Q.* What was it? *A. It was in the way she picked me out.*"

*Mr. Krum:* "I object to the testimony as incompetent." "The court will admit it." To which defendants at the time duly excepted.

The witness then detailed, that he was in the office of the chief of police and there were twelve men in there, or thirteen, and she picked him out stating, "You didn't have that hat that night; you had a derby hat and when you were running along, you were smoking a cigar when I stopped you." Witness then added that he had on a stovepipe hat in the chief's office, but did have on a derby the night of the election. "She said to me 'Don't you remember?' and I said to her, 'I don't remember seeing you.' She said 'Don't you remember somebody stopping you?' and I said 'Yes.' 'And telling you to hurry up, they are about to kill that man? And that was just about the carriage way, west of the carriage way about thirty feet, near the post this way, the hitching post, east.' That is the reason I know it is the woman. Nobody else being there, no one else could have stopped me. No one else could have said 'Hurry on.' Well, that's the way I know that's the woman. That's the only way I know that's the woman. That is all." *

"*Q. (By Mr. Krum:)* Why didn't you tell us that when you were examined in chief? *A.* You wouldn't let me."

Keeping in view that the learned trial judge had excluded all the efforts of the state's attorneys to have Mr. Von Phul give his reasons for saying Mrs. Bogines was the woman he met on the night of the homicide, and the further fact that counsel for the defendants had for the first time disclosed to the jury, in his cross-examination, the fact that Mrs. Bogines had, in a crowd, unaided, picked out Mr. Von Phul as the gentleman she met the night of the homicide, and *had insisted that was his reason for saying she was the woman*, thus challenging his identification of her, we can see no objection to permitting the witness to state that he was convinced by her manner of identifying him, and placing the jury in possession of all the facts attending the identification.

Law writers generally agree that "Evidence of identity, when given in the most positive and direct manner, is often but the mere opinion of the witness, and hence he is required to give the facts upon which he based his statement, as the jury have a right to it to aid them in their determination of the matter in issue." Harris on Law of Identification, sec. 7; Wharton's Crim. Ev. [9 Ed.], secs. 13, 17, 807.

Moreover after the explanation was given, it was little more than had already been testified. She had already testified that she had met Mr. Von Phul that night and urged him to "hurry up," and that she had afterwards recognized him in the chief's office, all without objection. He had testified he met a woman at that place that night and to her remarks. It was perfectly competent for him to state that he had since learned who she was, and as counsel for defendants had elected to elicit a part of the colloquy in the chief's office, it was competent to give the jury the benefit of the whole. After all it depended entirely upon the credit the jury otherwise gave to the two witnesses.

They saw them and heard them and were competent to weigh the fact. Under the circumstances we do not think it was reversible error. No ground for the objection was stated and at most it was not of sufficient materiality to reverse the judgment. R. S. 1889, sec. 4115.

Finally it is insisted that this cause shall be reversed because Mr. McDonald, in his argument to the jury, made the assertion that "Stark said that in the station he picked out Kaiser; that by his size and everything, he was the man." Judge Krum objected to this statement and called Judge Edmunds' attention to it, claiming there was no such 'evidence, and moved the court to correct the same; whereupon Judge Edmunds said, "The court doesn't remember anything about 'the station;' but Stark said defendant Kaiser resembles the man." To which defendants excepted.

Now, Mr. Stark testified that on the night of the murder he and his friend Smith were standing on the corner of Garrison and Franklin avenues talking. Smith was waiting for a car. He saw a scuffle or fracas going on and went at once as far as the driveway of Mr. Niedringhaus, and as he went saw three men run, two straight across and one ran towards him—this one man came within two feet of him. The electric light was back of Stark. He thought the man was going to strike him. "I had a side look at his face." He then described the man as six feet high, about his own size and wearing a stiff hat, cutaway coat. He then said he would not swear either of the defendants was the man, but "*Kaiser resembled him.*" He testified that the first time he saw Kaiser after that was in the police station. On cross-examination he said that all he said at the station was it resembled them somewhat from the side view.

Lewis v. Land Company.

The rule is well settled in this state, as elsewhere, that counsel have no right to comment upon the facts not in evidence or to put language in the mouth of the witness, but it would be going entirely too far to reverse a case merely because counsel inadvertently misstated a portion of the witness' evidence or its effect. In this case the witness had given a minute description of the murderer and had said the defendant Kaiser resembled him. The court did not misstate the evidence and as counsel for the state did not persist in his version of it but submitted to the court's correction there is no ground for complaint.

We have gone through the record carefully and we find no material error in it and the judgment is affirmed and the sentence pronounced by the law must be carried into execution. All of this division concur.