[Crim. No. 153. First Appellate District.—November 9, 1908.]

## THE PEOPLE, Respondent, v. JOHN HAYES, Appellant.

CRIMINAL LAW—MURDER—BOTH PARTIES ARMED—REFUSAL TO IN-
STRUCT AS TO MANSLAUGHTER—PREJUDICIAL ERROR.—Upon a trial
for murder, apparently growing out of labor troubles, it being
proved that both parties were armed and that the defendant was
wounded, but it is not shown with certainty who fired the fatal
shot, and defendant was convicted of murder in the second degree,
it was prejudicial error, requiring a reversal, to refuse to instruct
the jury as to the law of manslaughter at defendant's request.

ID.—MANSLAUGHTER A QUESTION FOR JURY—DUTY OF COURT.—No mat-
ter how conflicting the evidence, if there is any evidence tending to
show that the crime might be manslaughter, it is the duty of the
court to submit the question to the jury for its decision.

ID.—QUARREL—KILLING UNDER REASONABLE BELIEF OF IMMINENT DAN-
GER.—When the accused embarks in a quarrel with no felonious
intent or malice or premeditated purpose of doing bodily harm, and
under a reasonable belief of imminent danger he inflicts a fatal
wound, it is not murder, but may be manslaughter.

ID.—IMPROPER CROSS-EXAMINATION BY DISTRICT ATTORNEY — FALSE
STATEMENTS BY PERSONS NOT WITNESSES.—The court erred in per-
mitting the district attorney, in cross-examining a witness for the
defense, to ask questions in order to put before the jury the fact
that three persons, not witnesses at the trial, who were seen with
the defendant and his associates upon the occasion of the homicide,
falsely denied that they were present.

ID.—DYING DECLARATION INADMISSIBLE.—The court properly excluded
the dying declaration by the deceased that he fired the first shot at
the defendant, when there was no sufficient proof that he made it
under a sense of impending death.

ID.—EVIDENCE TENDING TO SHOW CONSPIRACY—ASSOCIATE UNLOADING
PISTOL WHILE DEPARTING.—Evidence was admissible as tending to
show a conspiracy that one of the associates with defendant was
seen immediately after the shooting running from the scene thereof
with a pistol which he was unloading, thereby showing that it had
been loaded at the place of the homicide.

ID.—DECLARATIONS OF DEFENDANT.—Evidence was admissible to show a
declaration by the defendant to the effect that the nonunion men
were carrying revolvers, and that he was liable to use the one seen in
his hand before night.

ID.—SCATTERING OF ASSOCIATES AFTER SHOOTING—RES GESTAE.—Evi-
dence was admissible to show that immediately after the shooting
the crowd of persons associated with the defendant immediately

scattered and ran away, as being part of the *res gestae*, since it was the natural and spontaneous outgrowth of the main occurrence.

APPEAL from a judgment of the Superior Court of Humboldt County, and from an order denying a new trial.   G. W. Hunter, Judge.

The facts are stated in the opinion of the court.

J. F. Quinn, and Wm. Kehoe, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

HALL, J.—Defendant was charged by information with the crime of murder, for the killing of one William S. Jenks on the eighth day of January, 1907, in Humboldt county. Upon his trial the jury returned a verdict finding him "guilty of murder in the second degree at the extreme mercy of the court." Defendant made a motion for a new trial, which was by the court denied, and judgment was rendered that he be imprisoned for the period of twenty years. Defendant appealed from the judgment and order denying his motion.

The first and principal contention of appellant is that the court erred in refusing to give to the jury an instruction requested by defendant upon the subject of manslaughter.

The court not only refused to give the requested instruction, but gave no instruction whatever upon the question of manslaughter.

The pertinent part of the instruction requested and refused is as follows: "But I charge you that murder, whether in the first or second degree, is the unlawful killing of a human being, with malice aforethought, and unless the malice aforethought is shown beyond a reasonable doubt the person doing such killing could not be found guilty of any higher crime than manslaughter, which is the unlawful killing of a human being without malice, and is of two kinds:

"I.   Voluntary, upon a sudden quarrel or heat of passion;

"II.   Involuntary, in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death in an unlawful manner or without due caution or circumspection."

It is not, and cannot be, contended that the requested instruction is not a correct statement of the law; but it is contended by respondent that there is no evidence in the record that tends to prove an unlawful killing without malice, and upon this ground justifies the refusal of the instruction. With this contention we find ourselves unable to agree.  ·

The killing of William S. Jenks grew out of certain labor troubles in the city of Eureka. In the same affray his brother Albert Jenks was killed, and appellant shot through the body.

On the eighth day of January, 1907, the steamboat "Gualala" was being unloaded at the wharf at the foot of Whipple street in the city of Eureka by a gang of nonunion stevedores. This was offensive to the members of the Longshoremen's Union, who, to the number of thirty or forty, including defendant, congregated near the foot of Whipple street shortly before the men engaged in unloading the steamer would quit work. A number of the union men were armed with pistols, as were also some of the men engaged in unloading the steamer. Both William and Albert Jenks were armed with pistols, and they were about the last, if not the last, of the men engaged in unloading the steamer to quit work for the day. This they did at about 5 o'clock, and took their way up Whipple street, passing through the crowd of union men without molestation, as previously had the other nonunion men, save that one Davis had been asked if he was scabbing, and had been chased and stoned by some members of the crowd. The Jenks brothers soon overtook two fellow workmen, Caughey and Stein, and with them proceeded on their way, walking on the sidewalk on the north side of Whipple street, going easterly, Caughey being between William and Albert Jenks, and Stein in the rear.

The crowd of union men soon followed the group of nonunion men. Much evidence was given which tended to show that in so doing they had a hostile purpose toward the departing nonunion men; but, on the other hand, evidence was given by defendant and witnesses called on his behalf tending to prove that they did so with no hostile or unlawful purpose, but with the intent to disperse to their various homes, following the suggestion of one of their number that they go home. When the crowd of union men reached a point opposite a row of cottages on Whipple street, Hayes, who was armed with a

pistol, worn at a belt, in front of his person, stopped and got a wheel that he had previously left there. He mounted the wheel, and started on, the crowd of union men giving way for him. He overtook the nonunion men and passed around them, his wheel falling upon the sidewalk in front of the Jenks brothers and Caughey. There is evidence that tended to prove that he intentionally dropped his wheel, and immediately drew his pistol and covered William Jenks with it. On the other hand, defendant gave evidence that as he passed the Jenks brothers, they jumped from the sidewalk, and William attempted to draw his gun, which was worn at a belt under his coat. That this so startled him that he lost his balance on the wheel, and immediately covered William Jenks with his gun, and commanded him not to draw his gun or he would shoot. At any rate, there is considerable evidence that as they left the sidewalk William Jenks attempted to draw his gun, and Albert Jenks did draw his gun. There is a conflict in the evidence as to who first attempted to draw. The evidence shows that the members of the crowd of union men closed up, and that one, called Art Smith, covered one of the Jenks brothers. The opposing groups crossed the street obliquely. The street is sixty feet in width, and without a sidewalk on the south side. No shooting occurred until the Jenks brothers had entirely crossed the street. There is much evidence to the effect that the two groups, as they crossed the street, faced each other, each in a menacing attitude toward the other, defendant and Art Smith covering one of the Jenks brothers, and William Jenks with his hand on his gun at his belt, and Albert Jenks· with his gun in his hand. While crossing the street defendant and William Jenks were but five or six feet apart. Several witnesses heard defendant tell William Jenks not to draw his gun, or he would shoot, and William reply that he would draw his gun. When the Jenks brothers had entirely crossed the street the firing commenced, with the result that Albert Jenks was killed on the spot, falling with his pistol in his hand, William Jenks was shot four times, from the effects of one of which shots he subsequently died, and defendant was shot through the chest by William Jenks. There is a sharp conflict as to who fired the first shot. Defendant testified that, his attention being for a moment distracted, William Jenks drew his gun and shot defendant

through the chest, who returned the fire. Other witnesses testified in support of this contention. On the other hand there was evidence given that the first shot was fired by Art Smith, and also evidence that the first shot was fired by defendant. Other persons from the union crowd also fired shots, but the evidence does not show what particular person fired the shot that killed Jenks. He was wounded four times, but three of the wounds were unimportant as to the results, and only one of the wounds had anything to do with causing death. Various witnesses estimated the number of shots at from seven or eight to fifteen.

From the foregoing statement of the evidence it is apparent that we have a case resulting in homicide, where both parties to the conflict were armed with guns, and where both parties had previously armed themselves in anticipation of a possible conflict; where, upon the conflict arising, both parties evinced a readiness to draw their guns and promptly did do so; a conflict as to who made the first hostile demonstration, and a conflict as to who fired the first shot, but a certainty that defendant was wounded by a shot fired by deceased, while it is uncertain as to who fired the shot that killed deceased.

The bullet that produced the fatal wound was shown to be much larger than the bullets that produced the other wounds, but which, if any, of the bullets corresponded with the caliber of the pistol used by defendant does not appear from the evidence.

Upon this state of the evidence we are clearly of the opinion that the court should have submitted to the jury the issue of manslaughter.

The case of *Stevenson* v. *United States*, 162 U. S. 313, [16 Sup. Ct. Rep. 839], is a case in its essential particulars similar to the case at bar. In the Stevenson case the judgment was reversed solely for the reason that the trial court refused to submit to the jury the issue of manslaughter. The language of the court, speaking through Justice Peckham, is exceedingly appropriate to the matter before us. It was there said: "The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; so long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might

9 Cal. App.—20

bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true, and whether it showed that the crime was manslaughter instead of murder. It is difficult to think of a case of killing by shooting, where both men were armed and both in readiness to shoot, and where both did shoot, that the question would not arise for the jury to answer, whether the killing was murder or manslaughter, or a pure act of self-defense. The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self-defense, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court.''

In this case both men were armed and ready to shoot, and both did shoot.

The trial court seems to have been of the opinion that the evidence showed, either an unlawful killing with malice aforethought, or a killing in necessary self-defense. This was also the position of the trial court in the Stevenson case, *supra,* and upon this subject it was said: ''The ruling of the learned judge was to the effect that, in this case, the killing was either murder, or else it was done in the course of self-defense, and that under no view which could possibly be taken of the evidence would the jury be at liberty to find the defendant guilty of manslaughter. The court passed upon the strength, credibility and tendency of the evidence, and decided as a matter of law what it seems to us would generally be regarded as a question of fact, viz., whether, under all the circumstances which the jury might, from the evidence, find existed in the case, the defendant was guilty of murder, or whether he killed the deceased, not in self-defense, but unlawfully and unjustly, although without malice. The presence or absence of malice would be the material consideration in the case, provided the jury should reject the theory of self-defense, and yet this question of fact is, under the evidence in the case, determined by the trial court as one of law and against the defendant.'' (See, also, *Gonzales* v. *State,* 35 Tex. Cr. 33, [29 S. W. 1091]; *Riptoe* v. *State* (Tex. Cr.), 42 S. W. 381; *Gilcrease* v. *State,* 33 Tex. Cr. 619, [28 S. W. 531]; *State* v. *Dunn,* 116 Iowa,

219, [89 N. W. 987]; *Wheeler* v. *Commonwealth,* 120 Ky. 697, [87 S. W. 1106].)

Between a killing in necessary self-defense and an unlawful killing with malice aforethought there is a wide margin. We apprehend that it seldom occurs that where the jury rejects the theory of self-defense in a case where the killing is the culmination of an encounter where force is threatened and used by both parties, they might not properly find that the killing was without malice. If the jury believed that defendant brought on the difficulty, and was the first to draw his gun, it does not necessarily follow that he intended to kill or shoot Jenks. Although the evidence clearly shows that he had Jenks covered during all the time they were crossing the street, and could at any time have killed him while so doing, he did not shoot or attempt to shoot, but, according to the testimony of Caughey, the principal witness for the people, only shot when Jenks attempted to draw his pistol. Under these circumstances can anyone say that the jury might not believe that he did not draw his gun with any intent to kill or with malice? The drawing of a deadly weapon in a rude, angry and threatening manner, in the presence of two or more persons, not in necessary self-defense, is a misdemeanor, but is not a felony unless done with felonious intent. (Pen. Code, sec. 417.) Where a difficulty is intentionally brought on for the purpose of killing deceased, the fact of imminent danger to the accused constitutes no defense; but when the accused embarks in a quarrel with no felonious intent, or malice, or premeditated purpose of doing bodily harm or killing, and under reasonable belief of imminent danger he inflicts a fatal wound, it is not murder, but may be manslaughter. (*Wallace* v. *United States,* 162 U. S. 466, [16 Sup. Ct. Rep. 859]. See, also, Wharton on Homicide, sec. 198; *State* v. *Partlow,* 90 Mo. 608, [59 Am. Rep. 31, 4 S. W. 14]; *Adams* v. *People,* 47 Ill. 376.)

Over the objection of defendant the district attorney was allowed to ask Erick Larsen, a witness for the defense, several questions, manifestly intended to get before the jury the fact that three named persons, who in fact were with the crowd of union men and defendant, upon the occasion of the killing of Jenks, had untruthfully sworn that they were not present on said occasion. None of these persons had been

examined as witnesses upon this trial, but the evidence clearly showed that they were present at the affray. It is perfectly plain from the record that the object of asking these questions was to get before the jury the fact that these persons, associated with defendant, had subsequently falsely denied being present. The questions should not have been asked by the district attorney, and the objections thereto should have been sustained.

The court excluded testimony of one John Davis that William S. Jenks, before his death, stated that he fired the first shot at John Hayes (defendant). This testimony was offered by defendant as a dying declaration. Before such testimony may be admitted it must be shown that the person making it made it under a sense of impending death, and that he had given up all hope of living. The preliminary evidence is of course addressed to the court. The evidence in this case does not show that the court erred in rejecting the evidence as to what Jenks said. The physician who attended the deceased stated that on the way to the hospital Jenks said, "I am done for," but when they reached the hospital the physician told the wounded man that "his chances were pretty slim." This seems to have been the only information given the wounded man by the physician, and it implied that he did have some chance of living. The witness Davis, by whom it was attempted to prove the dying declaration, said, "I don't think he realized that he was going to die."

The evidence falls far short of that held sufficient to admit testimony of a dying declaration in *People* v. *Dobbins,* 138 Cal. 694, [72 Pac. 339], and we cannot say that the court erred in excluding the offered testimony.

A witness, Fox, testified that immediately after the shooting he saw Frank Sidelinger running from the scene of the shooting with a gun in his hand. He was then asked, "What, if anything, was he doing with it?" and over the objection of defendant was allowed to answer, "He was unloading it." This was not error. It was, of course, quite proper for the people to establish by any competent evidence that any or all of the crowd that followed the Jenks brothers and were present at their shooting were armed with loaded pistols. Such proof tended to establish an unlawful and hostile purpose on their part, and in connection with other evidence tending to

show that they acted in concert in following and bringing on an encounter with the Jenks brothers, tended to sustain the theory of the people that the Jenks brothers were killed in pursuance of an unlawful conspiracy. The evidence was not admissible as the act of a co-conspirator in furtherance of the common design, but was admissible as a fact that showed that Sidelinger was armed with a loaded pistol during the time that he was acting with defendant and the other members of the crowd that followed the Jenks brothers. The essential matter proved by this testimony is that the pistol was loaded. The incidental matter that Sidelinger was *unloading it* proved that it was loaded. This was the essential and pertinent fact which made the evidence admissible. The testimony that Sidelinger had a pistol when seen by the witness was admitted without objection, and properly so, because it supported the inference that he had the pistol in his possession when, a few minutes before, he was with the crowd that followed and shot at the Jenks brothers. The fact that he was unloading the pistol when seen by the witness proved that the pistol was then loaded, and this supported the inference that it was loaded when Sidelinger was with the crowd that followed and shot at the Jenks brothers. This was a material and pertinent fact.

A witness, Hiram Johnson, testified that on the afternoon of the day of the shooting he had seen a revolver in the hand of defendant. He was then asked, ''State under what circumstances, and what was said between yourself and Mr. Hayes at that time?'' and over the objection of the defendant, answered, ''I made the remark that that was a fine revolver. He said, 'Yes, by God, and I am liable to use it before night, too. . . . Those other sons of bitches are carrying revolvers, and I am going to carry one, too.' ''

In this the court did not err. The circumstances in evidence strongly indicated that defendant referred to the non-union men working on the ''Gualala,'' upon one of whom he did in fact use the pistol before night of that day.

Over the objection of defendant the court permitted several witnesses to testify that the crowd ran away immediately following the shooting. Substantially every one of these witnesses testified that immediately after the shooting the crowd in which defendant was, scattered and ran. We think that

this was permissible as part of the *res gestae*. The testimony went no further than to show that immediately after the shooting the crowd fled from the immediate vicinity of the scene where the affray took place, leaving Albert Jenks dead upon the ground, William Jenks lying upon the ground fatally wounded, and defendant wounded, but able with the assistance of Art Smith to walk across the street to his bicycle. The act of the crowd in immediately dispersing was spontaneous and concurrent with the main event within the rule as laid down by the courts. This dispersing of the crowd was the natural and spontaneous outgrowth of the main occurrence.

Acts and declarations to be admissible need not precede or be precisely concurrent in point of time with the main fact. If they are the natural and spontaneous outgrowth of the main fact they are a part of the *res gestae*. (*Heckle* v. *Southern Pacific Co.*, 123 Cal. 442, [56 Pac. 56]; *State* v. *Arnold*, 47 S. C. 9, [58 Am. St. Rep. 867, 24 S. E. 926]; *Costillo* v. *State*, 31 Tex. Cr. 145, [37 Am. St. Rep. 794, 19 S. W. 892]; *State* v. *Kaiser*, 124 Mo. 651, [28 S. W. 182]; *Mitchum* v. *State*, 11 Ga. 615; 2 Ency. of Ev., 306-292.)

In discussing how far declarations are admissible as *res gestae*, it was said, in *Heckle* v. *Southern Pacific Co.*, 123 Cal. 442, [56 Pac. 56]: "A declaration, to be admissible on that ground, must be an undesigned part, or incident, of the occurrence in question. It must be in a general sense contemporaneous with the main occurrence, although, in case of a sudden accident or attack, the declarations would not be inadmissible merely because the blow or collision immediately preceded it; it must be the natural and spontaneous outgrowth of the main occurrence, and must exclude the notion of deliberation or calculation, or the design to manufacture evidence for future purposes."

Most of the cases relate to declarations made at or immediately following the main fact; but there can be no difference in principle between declarations which, under this rule, are treated as verbal acts, and acts. In the case at bar it is acts of the participants in the affray that were proved. These acts were the natural and spontaneous outgrowth of the shooting, and occurred before the smoke of battle had cleared away. The fight proven was simply a sudden and natural dispersal of the crowd. A complete and intelligible account of the

affray could scarcely be given without disclosing what became of the crowd.

The case of *People* v. *Stanley,* 47 Cal. 113, [17 Am. Rep. 401], cited by appellant, bears little or no analogy to the case at bar. In the Stanley case four persons were seen by a policeman to attempt a robbery. Subsequently, after they had left the scene of their crime, they were arrested. After their arrest one of the four (not the defendant) broke away from the officers having him in charge, and attempted to escape. This attempt to escape was clearly not a part of the *res gestae,* and it was so held.

The spontaneous and immediate dispersal of a mob or crowd engaged in a shooting affray is, we think, well within the rule of *res gestae,* and the court did not err in allowing proof thereof.

For the errors hereinbefore noted the judgment and order are reversed, and the case remanded for a new trial.

Cooper, P. J., and Kerrigan, J., concurred.