[Crim. No. 482.   Third Appellate District.—October 18, 1919.]

## THE PEOPLE, Respondent, v. GEORGE W. PECK, Appellant.

[1] CRIMINAL LAW—EXTORTION—WHO MAY COMMIT—ROBBERY—CONSENT.—Under section 518 of the Penal Code the crime of extortion may be committed by any person, but to constitute the crime of extortion in any case, the taking of the property must be with

1.   Extortion distinguished from robbery, note, 116 Am. St. Rep. 449.

the consent of the person from whom it is obtained; and it is the fact that the property taken must be with the consent of the person from whom it is obtained that distinguishes the crime of extortion from that of robbery, the latter crime being defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

[2] ID.—TAKING WITH CONSENT—QUESTION FOR JURY.—In a prosecution for the crime of extortion, the question whether the money was obtained with or without the consent of the person from whom it was taken is a question to be determined by the jury from the circumstances, as shown by the evidence, under which the transaction occurred.

[3] ID.—WHAT CONSTITUTES TAKING WITH CONSENT.—In a legal sense, in a case of this kind, money or property is obtained from a person with his consent if he, with apparent willingness, gives it to the party obtaining it, with the understanding that thus he is to save himself from some personal calamity or injury, notwithstanding that within himself he may still protest against the circumstances requiring him to dispose of his money in that way or for such a purpose.

[4] ID.—PREVIOUS CHARGE OF DEFENDANT WITH ROBBERY—ADMISSION OF COMPLAINT—INSTRUCTIONS.—In a prosecution for the crime of extortion, the point that the court erred in sustaining the district attorney's objection to the admission in evidence of a prior complaint based upon the same transaction and sworn to by the complaining witness, charging the defendant with the crime of robbery, does not possess much force where such prior complaint was read to the jury, and the jury was not instructed to disregard it, the complaining witness having previously been allowed to say that he swore to the complaint and that he recognized his signature to the document.

[5] ID.—IMPEACHMENT—CROSS-EXAMINATION — EXTRAJUDICIAL STATEMENTS.—In such prosecution, for the purpose of impeachment or the testimony of a witness for the defense, it was proper to permit the district attorney, on cross-examination, to question such witness as to certain statements made by him to the complaining witness, though not made in the presence of the defendant.

[6] ID.—LIMITED PURPOSE OF TESTIMONY—INSTRUCTIONS—DUTY OF COUNSEL.—The proper practice in such a case is for the party against whose interests such impeaching testimony is given to request the court to explain to the jury in its charge that such testimony is to be limited in its effect to the specific purpose for which it is allowed, and that the jury are likewise to be restricted in their consideration of it. Where no such instruction is proposed

by the defendant, he is without a legal reason for complaining against a failure of the court so to instruct the jury.

[7] ID.—INSTRUCTIONS—DUTY OF COURT IN CRIMINAL CASES.—It is the duty of a court in criminal cases to give, *sua sponte,* where they are not proposed or presented in writing by the parties themselves, instructions on the general principles of law pertinent to such cases, but it is not its duty to give instructions on specific points developed through the evidence introduced at the trial, unless such instructions are requested by the party desiring them.

[8] ID.—PREJUDICIAL QUESTIONS—DUTY OF OPPOSING COUNSEL.—Where a question asked of a witness for the prosecution, whereby it is sought to prove certain extrajudicial statements of a witness for the defense for the purpose of contradicting or impeaching certain portions of the testimony of the latter, is prejudicial to the defendant, counsel for defendant should move the court to strike out the question and specially request the court to instruct or admonish the jury not to consider it in determining the question of the guilt or innocence of the accused; and his failure to take that course leaves him in no position to complain on appeal.

[9] ID.—MISCONDUCT OF DISTRICT ATTORNEY—REMARKS NOT PREJUDICIAL.—Where in a prosecution for the crime of extortion the defendant tried to prove that the whole affair was a joke, the remarks of the district attorney, "I will make the same kind of a complaint against the defendant, or any other citizen of Plumas County, that perpetrates the same kind of a joke, and I will keep on doing it until the treasury of this county is empty," were not prejudicial to the rights of the defendant, neither did they constitute a threat of any character or anything calculated unjustly to influence the jury against the defendant.

APPEAL from a judgment of the Superior Court of Plumas County. J. O. Moncur, Judge. Affirmed.

The facts are stated in the opinion of the court.

M. C. Kerr for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant, jointly with one Elton Frazier, was charged with the crime of extortion. He demanded and received a separate trial, was found guilty by the jury, and was sentenced to state's prison, and now prosecutes this appeal from the judgment.

On January 27, 1919, the prosecuting witness, Louis Wing, was living on a farm near Crescent Mills, in Plumas County. He testified that he had known the defendant Peck for fifteen or twenty years and the defendant Frazier for about three years; that, at about five minutes to 3, on the morning of January 27, 1919, the defendants came to his house, knocked at the door, and asked to come in. Peck said he was cold and asked Wing to build a fire, which he did. As to what then occurred, Wing testified: "Peck says, 'Take a chair and sit down and be sociable,' which I did in my underclothes, and he says to me, 'Will you dance to my fiddling?' I says, 'I have, George, and I guess I can again,' and he says, 'Well, you are going to, now.' I looked up—he had a gun stuck in my face. I asked him what he would do. He says he was going to kill me. I asked him what I had done. There was a rock put in some grain at the ranch when he was threshing there and the grain didn't belong to me, but it didn't do any harm. The rock was found before it went into the machine. He said I knew how it got in there and I was going to tell him. I told him I was just as innocent as a new-born baby and I didn't know who put it in there. . . . And he kept on going to make me tell." There was some further conversation in which Frazier said Wing had called him a slacker, which the latter denied. The witness testified that Peck said, "You know very well if we go away and leave you here you will get me arrested." Wing said, "I promised him faithfully that I would not if he would let me go. At that time he ordered Elton Frazier to pull that gun and he did, but he never pointed it at me. . . . George Peck wanted me to put up something to keep my mouth shut after I faithfully promised him I wouldn't get him arrested, which I did; I put up $62.25. It was $63.25 and I asked him for one dollar back, and he gave me a dollar and took the $62.25 away with them when they left the house." It appeared that the money was in Wing's pants pocket in his bedroom. He testified: "Peck ordered Frazier to go and get it and Frazier went and got it and counted it out on the table, and I asked him for this dollar back and he gave it to me and he shut the purse up and handed it to Peck and that is the last I see of the money until I went back from here and it was given to me by different parties."

43 Cal. App.— 41

Asked why he permitted the defendants to take the money, Wing said, "Through fear, I had to give it up to them. I would give them anything I got for to get them to stop." He said he told them where the money was and made no objection to their taking it. He was asked if defendants gave any reason for taking the money, and answered, "It was put up as a forfeit so I wouldn't get them arrested for pulling those guns on me and threatening my life."

It further appears that, on the afternoon of the twenty-seventh day of January, the defendant was at the home of his brother, Joseph Peck, residing a short distance from the house occupied by Wing and in which the trouble occurred. Mrs. Peck, the wife of Joseph, remarked to the defendant that she saw Wing and the "Stampfli bunch" (the Stampflis were residents of the Crescent Mills section and friends of Wing), going toward Quincy (the county seat of Plumas County), and, she said, "I .wondered what they were going for," and the defendant replied, "I guess he was going over to have me arrested." Mrs. Peck asked defendant what reason Wing had for having him arrested, and the accused explained the episode occurring at Wing's house early that morning, but said it was all merely a joke or "done for fun." The defendant then left his brother's house and within a few minutes thereafter Glen Peck, son of Joseph and Mrs. Peck, appeared at the latter's home, gave his mother Wing's purse and the money taken from Wing by defendant and Frazier, and requested her to deliver the purse and its contents to Wing. Mrs. Peck took the purse and the money to Wing's house and placed them on a table in one of the rooms. Wing, on returning home, found the purse and the full amount of money taken from him as above explained.

It is first contended by appellant that the crime committed, if any, was robbery and not extortion. This question was first raised by a motion made by defendant that the court instruct the jury to bring in a verdict of not guilty, after the district attorney, in his opening statement, had told the jury that the defendant had taken the money from Wing by putting him in fear of bodily injury because of the display of firearms,

1. At the common law, extortion was confined to the un-
lawful taking by any officer, by color of his office, of any
money or thing of value that is not due to him, or more
than is due or before it is due, and it is so defined. In
most of the states the crime of extortion is defined by
statutes which are substantially declaratory of the common-
law offense. (8 R. C. L. 315.) In some instances, how-
ever, the statutory definitions have extended the scope of the
offense beyond that of the common law so as to include the
unlawful taking of money or thing of value of another by
any person, whether a public officer or a private individual,
and this is so in California, as will be observed from the
language of section 518 of the Penal Code, which reads as
follows: "Extortion is the obtaining of property from
another, with his consent, induced by a wrongful use of
force or fear, or under color of official right."

[1] Thus, it will be noted, in this state the crime may
be committed by any person, but to constitute the crime
of extortion in any case, the taking of the property must
be with the consent of the person from whom it is obtained;
and it is the fact that the property taken must be *with the
consent* of the person from whom it is obtained that dis-
tinguishes the crime of extortion from that of robbery, the
latter crime being defined as "the felonious taking of per-
sonal property in the possession of another, from his person
or immediate presence, *and against his will,* accomplished
by means of force or fear." (Pen. Code, sec. 211.)

From the evidence, the jury were warranted in finding
these facts, as impliedly they did: That the defendant as-
saulted and threatened to inflict bodily injury upon Wing
upon the pretext that the latter had said some unkind things
about the accused; that Wing was very much frightened
and was possessed of a fear that the defendant and his
companion, Frazier, had called at his house with the inten-
tion of injuring him and that they intended to do so; that
after Wing explained and protested that he had not made
the statements about the defendant attributed to him by the
latter, the accused asked Wing to promise him that he
(Wing) would not institute a proceeding in the courts
against him for assault; that Wing promised not to do so
if the defendant would not injure him, and that thereupon

the defendant asked Wing if he had any money in his possession, to which Wing replied affirmatively, stating the amount; that the defendant then demanded of Wing a delivery to him of the money, to be held by him (defendant) as an earnest of Wing's good faith in the agreement that he would not prosecute the accused; that Wing believed that that was the purpose for which the accused wanted the money and, being in fear that the defendant would inflict bodily injury upon him, if, indeed, not take his life, and to save himself from injury, willingly told Frazier where to get the money, and that Frazier obtained it and turned it over to the accused with the consent of Wing, who then believed that the money would be returned to him by the accused if he (Wing) should make no complaint against Peck for the assault. The jury were further warranted in finding that, as a matter of fact, it was the original intention of the defendant to retain, steal, and appropriate the money so obtained to his own use, and that he would have done so but for the fact that later in the day of the visit of himself and Frazier to Wing's house he had been informed by his sister-in-law that she had seen Wing and some of his friends going in the direction of the county seat of Plumas County, from which circumstance he surmised and expressed the conjecture that Wing's purpose in going to the county seat was to swear to a complaint against him, and that, actuated by the fear that he would be arrested and prosecuted for taking the money, he caused the money to be returned to Wing. Upon these facts, which we repeat are clearly deducible from the evidence, the jury were justified in concluding and finding that the crime of extortion had been committed. In brief, thus they were justified in finding, if they believed the evidence, as manifestly they did, that the money was obtained by the defendant from Wing with the latter's consent, "induced by a wrongful use of fear."

2. Defendant's counsel asked the prosecuting witness upon cross-examination whether the money was taken by defendant "without his [the said witness] consent." To that question an objection by the district attorney on the usual

grounds and on the special ground that it called for the conclusion of the witness was sustained by the court.

We can see no legal objection to the ruling. [2] Whether the money was obtained from Wing with or without his consent was a question to be determined by the jury from the circumstances, as shown by the evidence, under which the transaction occurred. Besides, it would be a difficult question for a lay witness to answer so that a jury of laymen would understand the answer. Wing could under the circumstances have consented to the taking of the money by Peck, and yet protest in his own heart against his money being taken for that purpose. A man, under certain circumstances, may loan another a small sum of money, knowing to a moral certainty at the time he loaned it that he would never get it back, and so mentally reserve a "kick" or a protest against disposing of his money in that way. Thus he would consent to parting with his money, but under protest with himself or not with that free consent or willingness that he would pay out money to satisfy an obligation or to subserve some charitable or useful public purpose. It is more than probable that such was Wing's attitude of mind with reference to the transaction, but if he had attempted thus to explain it on the witness-stand he would most likely not only himself have become confused and given an unintelligible representation of the fact, but would have so beclouded the issue as to that element of the offense as to have made it difficult for laymen to decide. [3] In a legal sense, in a case of this kind, money or property is obtained from a person with his consent if he with apparent willingness gives it to the party obtaining it with the understanding that thus he is to save himself from some personal calamity or injury, notwithstanding that within himself he may still protest against the circumstances requiring him to dispose of his money in that way or for such a purpose. Wing repeatedly testified that the money was delivered to the defendant as "a forfeit"—that is, as a guaranty that he would not institute criminal proceedings against Peck for the assault the latter made upon him with a deadly weapon—and that the money was to be returned to him; that, in other words, he put

the money up as "a forfeit" for the purpose of averting
injury to himself at the hands of the defendant, the same
to be returned to him if he did not prosecute Peck. In-
deed, he said that he would readily have done anything he
could do to save himself from being injured. With this
evidence before them and the enlightenment imparted to
them by the court upon the law of the case, the jury them-
selves were abundantly able to decide the question intelli-
gently and justly. Hence, it was eminently proper in this
case for the court to sustain the objection and so leave
entirely to the jury the determination, under its instruc-
tions, of the question whether the money was obtained by
the defendant with or without the consent of Wing. It
may be suggested, however, that had counsel asked Wing
whether he had *given* his consent to the defendant to take
the money, the question would then have been in a form
which would the more likely have elicited in the answer of
the witness the statement of a fact.

[4] 3. For the purposes of impeachment, counsel for
the defendant, having first elicited from Wing the admis-
sion that he had, prior to the filing of the charge of extor-
tion against Peck, sworn to a complaint, based upon the
transaction upon which the charge here was founded,
charging the defendant with the crime of robbery, offered
the complaint charging the latter crime in evidence. Coun-
sel then read before the jury and into the record the rob-
bery complaint. Thereupon an objection by the district
attorney was interposed to the admission in evidence of
said complaint. Before the court ruled on the objection,
defendant's counsel again asked that the complaint be al-
lowed to stand in the record, to be designated or marked
as "defendant's exhibit one for this case." The court then
ordered that it "be marked as offered as defendant's ex-
hibit one in this case," but sustained the objection of the
district attorney. Defendant's counsel then asked · Wing if
he swore to "that complaint in the justice's court," and to
that question the court sustained the people's objection, say-
ing to defendant's counsel, "I think you have sufficient rec-
ord now for that, Mr. Kerr, and we will not go into it
further." The witness, Wing, had previously, without ob-

jection, been allowed to say in response to a question by
defendant's counsel that he swore to the complaint in the
justice's court and that he recognized his signature to the
document. No motion was made to strike the complaint
from the record after defendant's counsel read it into the
record, and from the court's language in ruling against fur-
ther inquiry into the matter it is evident that the court
considered and understood that the complaint was in the
record. At any rate, it having been read to the jury and
not stricken out and the jury not having been instructed to
disregard it, it was in the record for all practical purposes.
Hence, the point sought to be maintained here that the
court erred in sustaining the district attorney's objection to
the admission of the complaint after that document had
gone into the record and before the jury does not appear
to us as possessing much force. The defendant got the full
benefit of the evidence and we cannot see what more he
could have obtained had the court not sustained the ob-
jection.

[5] 4. Elton Frazier, who accompanied the defendant to
Wing's house and was present when the occurrences above
narrated took place, testifying for the defendant, said that
when he and defendant reached a point a short distance
from the house of Wing, they stopped for a moment and
the defendant then "said something about having a little
fun with Wing." Frazier also said that Peck, while talk-
ing to Wing, was sometimes rather rough in his language
and at other times "he was laughing and joking about it"—
that is, about the entire transaction, both Frazier and de-
fendant claiming that the money was obtained as a loan and
that Wing so understood it. On cross-examination, the dis-
trict attorney asked Frazier this question: "While you
were down at the corral talking to Wing after leaving the
house and while Peck was still in the house, did you say
anything to Wing, that you thought perhaps that it was a
good thing that you came there and that you might have
saved his life?" Over an objection by defendant that
the question was not pertinent cross-examination, irrelevant,
incompetent, and immaterial, and "not said in the presence
of the defendant," and, therefore, not binding upon him,

the court permitted an answer to be returned thereto. The witness answered, "Wing said he thought I saved his life and I told him I thought that it was a good thing that I came over there. That is the way I said it." It is now argued that the ruling involved error highly prejudicial to the rights of the accused.

The question was obviously for impeachment purposes and to lay the foundation for counteracting the effect of the testimony of the witness, Frazier, tending to indicate that the defendant had in mind no criminal purpose in going to Wing's house but went there merely to have "some fun" at Wing's expense, and we think that the question was proper cross-examination for that purpose. The general trend of Frazier's testimony was that the whole matter was intended by the defendant as a joke, while the statement which the district attorney undertook to make him admit that he made to Wing after the trouble had ended would show, if he made it, that he regarded the episode as more than a joke—as, indeed, so serious that, in his opinion, but for his presence in the house at the time the defendant might have taken the life of or seriously injured Wing. Of course, the testimony called for by the question could not be used as substantive proof of the defendant's guilt, for manifestly declarations of a party concerning a criminal or unlawful act not made in the presence of one charged with and on trial for the crime cannot be used against or bind the latter. But it frequently happens (and necessarily so when there is occasion for it) that testimony bearing upon the crime and the connection of the defendant with it, which would be incompetent and inadmissible as substantive proof of the crime, is nevertheless allowed under the rule authorizing the impeachment of the testimony of witnesses by thus showing that they had previously made statements contradictory to and inconsistent with their testimony. [6] The proper practice in such a case is for the party against whose interests such impeaching testimony is given to request the court to explain to the jury in its charge that such testimony is to be limited in its effect to the specific purpose for which it is allowed and that the jury are likewise to be restricted in their consideration of it. No

such instruction was given in this case, nor did the defendant propose such an instruction, for which dereliction he appears on this appeal without a legal reason for complaining against a failure of the court so to instruct the jury. [7] It is the duty of a court in criminal cases to give, *sua sponte,* where they are not proposed or presented in writing by the parties themselves, instructions on the general principles of law pertinent to such cases, but it is not its duty to give instructions on specific points developed through the evidence introduced at the trial, unless such instructions are requested by the party desiring them. This rule is so well settled that authorities need not be cited herein in support of the statement thereof.

5. The district attorney called to the stand one Meyer, by whom he proposed to contradict or impeach certain portions of the testimony of the witness, Frazier, said Meyer having been present and heard a conversation held on the day succeeding that of the episode in the Wing house, and which was taken down by a stenographer, between Frazier and the district attorney as to what took place at Wing's house between the defendant and Wing. The district attorney's interrogation of Meyer was based upon the written report of such conversation, and, among other questions, Meyer was asked by the prosecutor (reading from the said report) if, in that conversation, Frazier was not asked this question by the district attorney and thereto returned the answer as here given: "Q. Why did George ask for the money? A. I suppose he thought Wing would tell on him and perhaps that would keep him from telling." The court sustained the objection of counsel for the defendant to the question. It is here contended that the question to and the answer of Frazier in said conversation, so brought before the jury, although not confirmed by the witness, Meyer, were prejudicial to the defendant and that the court should have instructed the jury to disregard them. [8] The first answer to this proposition is that counsel should have moved the court to strike out the question and the answer thereto, and have specifically requested the court to instruct or admonish the jury not to consider them in determining the question of the guilt or innocence of the accused, and that his failure to take that course leaves him in no position to complain here. There was no objection that a proper foun-

dation was not laid for the testimony so sought to be brought into the record, and we may, therefore, assume that a proper foundation was laid for it. But the question as put during the course of the conversation did not call for the conclusion of the witness, as is the contention here, but, while the answer then and there given appears to have involved the opinion of the witness as to the reason the defendant asked Wing for the money, it was, in our opinion, perfectly proper to prove at the trial that Frazier extrajudicially made such a statement in reply to the question, not for the purpose of proving a substantive fact against the defendant, but to show that his conception of the nature of the transaction was different at the time of said conversation and less favorable to the accused than as he attempted to make it appear at the trial.

[9] 6. The defendant complains of the following language used by the district attorney in his address to the jury and declares that it was without justification in the record: "I will make the same kind of a complaint against that defendant, or any other citizen of Plumas County, that perpetrates the same kind of a joke, and I will keep on doing it until the treasury of this county is empty." Counsel for the defendant excepted to the foregoing remarks, assigning them as prejudicial to the rights of the defendant, in that they involved "a threat to the jury as to what will take place if they don't convict this defendant."

There was, as we have shown, a statement by the witness, Frazier, that tended to indicate that the defendant's conduct with and toward Wing was intended merely as a joke, and it is perhaps that testimony which furnished the motive for the remarks of the district attorney complained of here. We perceive nothing in the language referred to which is objectionable. It involved a mere ironical reference to a claim which might be predicated upon the inference from Frazier's testimony that the affair at the Wing house was only a joke. And it would require a long stretch of the imagination to see in that language a threat of any character or anything calculated unjustly to influence the jury against the defendant.

We have now considered all the points urged against the result arrived at below, in none of which, as is manifest,

have we found any justification for disturbing either the judgment or the order. Accordingly, the judgment and the order are affirmed.

Ellison, P. J., *pro tem.*, and Burnett, J., concurred.