[Crim. No. 1467.   Third Appellate District.—April 30, 1936.]

THE PEOPLE, Respondent, v. ELIJAH C. BEST, Appellant.

George R. Freeman, Elmer Laine and Milton M. Hogle for Appellant.

U. S. Webb, Attorney-General, Ralph H. Cowing, Deputy Attorney-General, and W. T. Belieu, District Attorney, for Respondent.

LEMMON, J., *pro tem.*—An indictment was returned against the defendant charging him with the murder of one Ernest B. Hanks. From a judgment of conviction of manslaughter and from an order denying his motion for a new trial this appeal was taken.

Hanks and the defendant had been friends and neighbors for some period of time. In April of 1935, the two men entered into a contract to cut hay upon what is known as the "old Crawford Ranch" near Willows, in Glenn County. The defendant, Best, did not but Hanks did have a team of horses, and therefore Hanks suggested that they borrow a team from a Mr. Aleck Holman, and at the same time stated that the Holman team could be purchased for $50. This team was borrowed and the men entered upon the work. When the work had progressed for a few days defendant became apprehensive that Hanks might charge him for the use of the borrowed team, and so, unknown to Hanks, Best purchased the Holman team. Thereafter, and on the evening of May 13th, Best observed that one of the Holman horses which Hanks had been using was all "fagged out" and had a raw spot on her shoulder, and her neck was chafed. These facts Best called to Hanks' attention, and received the reply, "She is all right." During the following day Best concluded that he would gain possession of this horse in order to see that she was cared for and not overworked.

That evening at the end of the work day Hanks hitched the team he had been working to a wagon and tied the other team on behind, for the reason that he intended to take the team Best had been working home that night to shoe them. As Best passed Hanks he called Hanks and jokingly commented about his wagon, and then said, "How will you trade horses, or aren't you a horse trader?" To this Hanks replied, "Nothing doing." "Well," Best said, "you have got the good team the biggest part of the job; don't you think you ought to change with me and let me have them the rest of the job? I am getting kind of tired driving old Pete." Hanks countered with, "Nothing doing." Best then said, "Ernest, I have a little surprise for you. I have bought this team." This provoked Hanks, and he used profanity in expressing his anger toward Best. Hanks went around the front of the team hitched to the wagon, while Best went to the rear to unfasten a halter-strap of the team tied to the back of the wagon. Hanks mounted the wagon, took up a neck-yoke, and said, "Best, God damn you old son-of-a-bitch, I could beat your brains out with this neck-yoke," and "Yes, God damn you, I will hit you with it." Best moved over to where his hay-fork was, and from there to the place where the men were in the habit of getting hay to take home for Best's cows. Hanks laid the yoke down and followed Best, driving the team. Hanks continued talking, but, between Best's deafness and the noise of the wagon, Best was unable to hear what was said. When they reached the hay Best asked Hanks not to shoe his horse. Hanks was adamant, and Best said, "Remember, Ernest, I have told you that the horse is mine, and if you shoe him you will have to shoe him at your own expense." Hanks again profanely expressed himself about Best. Best placed a small fork-full of hay on the wagon, and turned his back to get another fork-full, when Hanks jumped from the wagon onto Best's back. Best was knocked to the ground; he rolled over on his back and, as Hanks came toward him, Best raised up his feet, caught Hanks in the stomach or groin, and Hanks' momentum carried him over Best's head. Best jumped to his feet and grabbed the pitchfork. Hanks started for Best a second time, and Best hit him on the top of the head with the fork. Hanks came after Best a third time, and Best hit Hanks on the side of the head. Hanks expired later the same eve-

ning. The autopsy revealed an incised wound on the top of the head about one and one-half inches long, a bruise on the left side of the head just above the ear. The ear had been about half torn off. After removing the scalp, a fine linear fracture was found in the left temple-bone perpendicular to the top of the head. Death was caused through the presence of a clot on the brain, the clot resulting from a severed artery.

The foregoing recital of facts in connection with the fatal affray is taken from the testimony of the defendant. The only other eye-witness to the homicide was a Mrs. Adams. Her testimony is relatively unimportant. It is at variance with demonstrated facts, and indicates that she is of feeble mentality.

Best was of the age of 67 years, and weighed 165 pounds. Hanks was twenty-three years his junior, and weighed from twenty to twenty-five pounds less than his assailant. Best had suffered an acute heart attack two years before the fatal affray. The attack had left his heart in a weakened condition, and he found it necessary to have on hand medicine to stimulate his heart whenever needed.

The court instructed the jury that the crime of manslaughter was included in the charge of murder. A form of a verdict of manslaughter was handed to the jury upon their retirement, together with the usual forms in a murder trial. The court, however, failed to instruct the jury as to the definition of manslaughter, or as to what facts must be found by them before they could convict of the lesser offense.

At the trial the defendant relied upon the plea of self-defense. This is indicated not only by the evidence offered by him, but also by the instructions which he submitted. His brief upon this appeal, as well as the oral argument of his counsel, show clearly that the case was tried on the theory that the crime of manslaughter was not involved.

"On the facts of the immediate case it is sometimes difficult to draw the exact line between homicide in self-defense and manslaughter. Nevertheless, the law distinguishes between the two, and a statute stating elements of manslaughter is inapplicable to a plea of self-defense. Conversely, self-defense has no place in a definition of manslaughter or any other degree of homicide, as it excuses, rather than fixes the degree of the homicide and entitles accused to a full acquittal." (30 C. J., p. 45.) However, the evidence and the

inferences reasonably to be drawn therefrom may be sufficient to warrant the jury in concluding that, though the killing was not justifiable under a plea of self-defense, it was done under such circumstances as to reduce the offense to voluntary manslaughter. If malice is lacking and the mortal blow is struck in the heat of passion, excited by a quarrel, sudden, and of sufficient violence to amount to adequate provocation, the offense is reduced to manslaughter. (*People* v. *Freel*, 48 Cal. 436.) "The dividing line between self-defense and this character of manslaughter seems to be the existence, as the moving force, of a reasonable founded belief of imminent peril to life or great bodily harm, as distinguished from the influence of an uncontrollable fear or terror, conceivable as existing, but not reasonably justified by the immediate circumstances. If the circumstances are both adequate to raise and sufficient to justify a belief in the necessity to take life in order to save oneself from such a danger, where the belief exists and is acted upon, the homicide is excusable upon the theory of self-defense (*Commonwealth* v. *McGowan*, 189 Pa. 641 [42 Pac. 365, 69 Am. St. Rep. 836]); while, if the act is committed under the influence of an uncontrollable fear of death or great bodily harm, caused by the circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense, the killing is manslaughter" (*Commonwealth* v. *Colandro*, 231 Pa. 343 [80 Atl. 571]).

It is our conclusion the evidence in this case warranted the jury in deciding that the killing was not justifiable under the self-defense plea, but that, under the authorities cited, the accused was guilty of the crime of manslaughter.

Respondent makes the point, however, that appellant did not offer any instruction upon the subject of manslaughter, and that the instructions which he did submit disclosed a deliberate purpose to rest his defense upon the proposition that he was either guilty of murder or was innocent of any crime. The case of *People* v. *Wright*, 167 Cal. 1 [138 Pac. 349], is cited to sustain the trial court. In that case the trial court refused instructions submitted by the defendant upon the subject of manslaughter in a case where the evidence would have justified a verdict of involuntary manslaughter. The action of the trial court was approved partly because those instructions were offered after the defendant

had submitted instructions which showed that he took the position that he was either innocent or guilty of murder in the second degree. Had the trial court in the instant case refused to give the instruction, and the form of verdict which it did give upon the subject of manslaughter, and had the verdict of the jury been murder, as in the case of *People* v. *Wright, supra,* that case might appropriately be cited as authority for respondent's position.

It is important to note that the district attorney submitted an instruction which did define manslaughter. It was disallowed by the trial judge. It cannot be said that appellant is precluded from complaining that a proper instruction defining manslaughter was not given because such an instruction was not offered by him. It is the duty of the court in a criminal case to give, of its own motion, instructions on the general principles of law pertinent to such cases, where they are not proposed or presented in writing by the parties themselves. (8 Cal. Jur., p. 309.) Also, appellant was privileged to rely upon the instruction presented by the district attorney. It would have been an idle act for him to have submitted an instruction in substance the same as that offered by the prosecution.

Respondent has cited a number of cases in which judgments of conviction of the crime of manslaughter have been affirmed where the charge was murder and the evidence did not justify a verdict of manslaughter, and in which cases the court instructed the jury as to the essential elements of the lesser crime. In those cases a conviction of the crime charged would have been sustainable under the evidence. Obviously, they have no application to a situation where, as here, it was proper that the jury be instructed as to the definition and essential elements of manslaughter and where the jury returned a verdict of guilty of that offense without being previously properly instructed thereon.

■ Appellant complains that the trial court should have granted a motion which he made to quash the indictment. The motion was predicated upon the fact that the district attorney and the official phonographic reporter gave unsworn testimony before the grand jury in the proceedings leading up to the voting of the indictment. That these two officials may be present at the sessions of the grand jury cannot be questioned. (Sec. 925, Pen. Code.) The grounds upon

which an indictment may be set aside on motion are enumerated in section 995 of the same code. Hearsay or illegal evidence received by the grand jury is not embraced therein. As a basis for such a motion: *Borello* v. *Superior Court,* 8 Cal. App. 215 [96 Pac. 404]; *People* v. *Collins,* 60 Cal. App. 263 [212 Pac. 701]; *People* v. *Schmidt,* 33 Cal. App. 426 [165 Pac. 555].

█ It is claimed that prejudicial error was committed by the trial court in refusing to give certain instructions offered by appellant, and in giving another instruction on the court's own motion. These instructions related to self-defense. The verdict of manslaughter is equivalent to an acquittal of the charge of murder. (*People* v. *Muhlner,* 115 Cal. 303 [47 Pac. 128]; *People* v. *Smith,* 134 Cal. 453 [66 Pac. 669]; *People* v. *Gilmore,* 4 Cal. 376, 380 [60 Am. Dec. 620].)

It is unnecessary to consider these instructions, because on a retrial there should be no occasion to instruct upon self-defense.

The judgment and the order are reversed.

Thompson, J., and Pullen, P. J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 25, 1936.