[Crim. No. 4221. In Bank.—August 22, 1939.]

THE PEOPLE, Respondent, v. WILLIE B. MITCHELL, Appellant.

Willard W. Shea, Public Defender, and Hugh K. Forsman, Assistant Public Defender, for Appellant.

Earl Warren, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

CURTIS, J.—This appeal is from the judgment and order of the trial court denying defendant's motion for a new trial.

The defendant, Willie B. Mitchell, met Fannie Nolden some time in 1936 at a night club in the city of Sacramento. Later they met again in the early part of the following year. Thereafter they met frequently and soon began living together as man and wife although they were never married. They both belonged to the colored race. He was less than seventeen years of age and she was twenty-five. In the summer of 1937 they moved to Oakland and took up their residence at Ninth and Center Streets in that city. Their life together was not at all times harmonious, and according to the testi-

mony of the defendant, Fannie Nolden "ran off" on a number of occasions. Some few days prior to November 21, 1937, Fannie Nolden left the home at Ninth and Center Streets, and went to the home of Mr. and Mrs. Upshaw at 1115 Center Street, two blocks from Ninth and Center Streets. Mr. and Mrs. Upshaw were the uncle and aunt respectively of the defendant. On November 21, 1937, the defendant called two or three times at the home of his uncle and aunt, and at least on one of his earlier visits during that day he saw Fannie Nolden, but nothing of any moment took place between them at that time. He returned to the Upshaw home about 7 o'clock of the same day with an acquaintance by the name of Leonard Franklin. It was just getting dark. He had two pistols on his person, and Leonard Franklin had one. On entering the Upshaw home on that evening, he met and talked with his uncle and aunt in their living or "front" room. He then asked his aunt if he could have some food. She replied, "Sure, go down in the kitchen, help yourself." He and Franklin then went to the kitchen. When they entered they found Fannie Nolden and Dorothy Robinson, the latter a young lady cousin of the defendant. Fannie Nolden was washing dishes and Dorothy Robinson was seated at a table eating a meal. When defendant first entered the kitchen, he asked Fannie Nolden to fix him something to eat. Fannie replied, "I don't have anything to fix. This ain't my house." Defendant then said, "You ain't going to fix it?" He then reached down in his waist under his coat, and pulled out two "guns". Fannie then said, "Oh, yes, I fix it. Yes, I fix it," and ran across the room near the water tank. The defendant then stepped around and started shooting, and Fannie fell to her knees, and the defendant stepped out a few feet further and started shooting again. Immediately after the shooting, the defendant put both pistols in his left hand and opened the back door and left the room. According to his own story, he left Oakland and went to San Francisco. From there he went to Los Angeles and eventually reached his old home in Arkansas. He remained in Arkansas for some months. Later he went to St. Louis, where he was arrested, charged with the crime of murder, and brought back to Oakland. The body of Fannie Nolden was examined by Dr. Mainwaring at 7:50 o'clock on the evening

of her death. He found one bullet lying loose in her undergarments over the chest. An autopsy was performed on the body of the deceased on the following day by Dr. Hamlin. He testified that he found six bullet wounds on her body, but he discovered no marks other than the bullet wounds on her body. One bullet entered the tip of the left shoulder and passed out under the left shoulder. Another bullet entered the inner angle of the armpit, and passed into the chest cavity at the third rib, passed through the left lung, through the left ventricle of the heart, through the right lung, and lodged four inches below the armpit. This bullet was recovered. The courses of other bullet wounds were described by the doctor, six in number. Two bullets were removed from the body during the autopsy. The wounds found upon the body of the deceased were pronounced fatal by the doctor and were the cause of her death. Besides the two bullets recovered from the body and the one found in the clothing of the deceased, a fourth was found embedded in the woodwork of the kitchen, just back of where the deceased fell when she was shot. No one seemed to know just how many shots were fired. Dorothy Robinson, who was the only eye-witness to the shooting, said she was unable to tell the number of shots that were fired by the defendant. Leonard Franklin who entered the kitchen with the defendant was not called as a witness. He was not seen after the shooting by any witness who testified in the case, and neither the prosecution nor the defendant had been able to locate him before the trial. The defendant testified that he did know the number of shots that were fired. He never denied the shooting. He admitted his guilt to the arresting officers in St. Louis, and at that time made a written statement giving his version of the shooting. He also took the stand as a witness at his trial and admitted that he shot the deceased. His version of the shooting does not entirely agree with that given by Dorothy Robinson, and will be discussed later. No claim is made by the appellant that the evidence is insufficient to support the verdict of the jury finding him guilty of the crime of murder as charged in the information. The only ground assigned by him for a reversal of the judgment is that the court erred in refusing to give an instruction on manslaughter. He predicates his right to such an instruction upon his testimony given at the trial of the the case. He testified that when he entered the kitchen of

the Upshaw house on the evening of the shooting, he said to Fannie Nolden: "Hello, Toots," and touched her on the back and said, "How about fixing me something to eat?"; that she looked at him and said, "I don't have nothing to eat here, I can't fix you anything;" that she then walked to the sink, and he went to the door and called, "Auntie, can I have some food?"; that he turned and came back while Fannie Nolden was still at the sink and said, "What's wrong?", and she replied, "I don't have time to talk to you"; that he then said, "How about some of my money then?", and she replied, "I ain't got time to fool with you. I am busy," and that he then said, "Leaving all jokes aside, Fannie, let me have some of my money;" that at that time she was in front of the cupboard and wheeled around with a knife in her hand and said, "I'll give it to you. I'll fix you!" that he then jumped back to the door and said, "Don't come over here," but she kept coming. "I could not get out the door. I come up and knocked the automatic safety off, just went off like that, and it stopped. When the automatic stopped shooting, Fannie laid one hand on the stove and looked at me and gritted her teeth, and I was trying to get the door open from the back with this hand, back with this hand. When I went to move around the automatic went off one more time."

■ Appellant prepared an instruction defining manslaughter in the language of section 192 of the Penal Code with the added statement, "If you are satisfied beyond and to the exclusion of a reasonable doubt that the defendant unlawfully killed Fannie Nolden without malice and upon a sudden quarrel, or in the heat of passion, your verdict should be guilty of manslaughter." This proposed instruction the court refused to give. We think it was properly refused. Nothing in appellant's testimony indicated in the slightest extent that appellant killed the deceased either upon a sudden quarrel or in the heat of passion. At most his testimony tended to show that he drew his automatic pistol in self-defense, by an inadvertence he knocked off the safety appliance, and the gun was accidentally discharged. This evidence was properly before the jury for the purpose of their determination as to whether the defendant killed deceased in self-defense, or whether her death was due to accidental means. This evidence in no way tended to prove that the homicide

was committed upon a sudden quarrel or heat of passion. There was no error, therefore, in the trial court's refusal to give the proffered instruction. In support of his claim that the refusal to give this instruction was error and that it was prejudicial of his legal rights, the appellant argues that had such an instruction been given the jury under all the evidence might have found him guilty of manslaughter instead of murder. We find no force whatever in this argument. █ The jury was correctly and properly instructed respecting the decrees of murder, and of its power to fix the punishment in case it found the defendant guilty of murder in the first degree. With these instructions before it, the jury found the appellant guilty of murder in the first degree without recommending life imprisonment. If under the evidence and these instructions, the jury rendered a verdict calling for the death penalty, it is not reasonable to suppose that its verdict would have been different had the proposed instruction on manslaughter been given.

█ It might be appropriate to add a few words regarding the claim of the appellant that he was attacked by the deceased with a knife. Dorothy Robinson, who, as we have stated, was the only eye-witness to the tragedy, flatly contradicted the appellant in his statement that the deceased attacked him with a knife. She was asked the direct question as to whether Fannie had anything in her hand at the time appellant shot her, and she replied, "No. She did not." No knife was found near the body or in any place on the kitchen floor after her death although a careful search of the room was made by the officers on their arrival on the scene. Appellant stated to the officers in St. Louis that she attacked him with a butcher knife, and it was so described in his written statement made to said officers at the time of his arrest. At his trial, the appellant testified that he did not pay any attention to the knife and could not tell what kind of a knife it was and repudiated his statement made to the officers at St. Louis that it was a butcher knife.

There is also considerable doubt whether the gun with which he shot deceased was an automatic pistol. His statement made at St. Louis contains the following account of the shooting, "I pulled out a 38 caliber Smith & Weston blue steel revolver which I had concealed in my waistband of my shirt and trousers and shot in the direction of Fannie."

Appellant gave as a reason for being armed with two pistols when he left his room and went to the Upshaw home on the day of the tragedy that he had been attacked on two previous occasions and severely injured before leaving Sacramento and that he saw his assailant on the streets of Oakland on the morning of the day he killed the deceased. He further stated that he was going to a dance that evening, but gave no sufficient reason for arming himself on that occasion except that he might meet the man who had assaulted him in Sacramento. Whatever may have been his motive in arming himself, there is no credible evidence from which an inference might be drawn that he had any intention of violently assaulting, and much less intention of killing, the deceased before he entered the Upshaw home on that evening. Nevertheless, the evidence is clear and convincing that he deliberately shot the deceased in cold blood. It is beyond human belief that his automatic pistol could have been accidentally discharged from four to six times and that each shot took effect in the body of the deceased. This is especially true of the last shot that was fired when, he says, he was attempting to leave the room through the rear door of the house, which would place him with his back towards the deceased. In stating that all shots fired by the appellant took effect in the body of the deceased, we have not overlooked a bullet which was found embedded in the woodwork of the room. From all the evidence in the case, it is apparent that this bullet passed entirely through the deceased's body, and then embedded itself in the woodwork just back of where the deceased was standing when she was shot.

We find no error in the record, and are of the opinion that the evidence is amply sufficient to support the verdict of the jury.

The judgment and order denying the motion for a new trial are, and each of them is affirmed.

Edmonds, J., Shenk, J., and Thompson, J., *pro tem.*, concurred.

HOUSER, J., Dissenting.—I dissent.

My inability to agree with the conclusion that has been reached herein by my associates arises from their ruling that defendant's rights were not prejudiced by reason of the fact

that, in disregard of defendant's request therefor, the trial court refused to give to the jury an instruction relative to the crime of manslaughter, as follows:

"Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion.

"2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. (Sec. 192, Pen. Code.)

"If you are satisfied beyond and to the exclusion of a reasonable doubt that this defendant unlawfully killed Fannie Nolden, without malice and upon a sudden quarrel, or in the heat of passion, your verdict should be guilty of manslaughter."

As is stated in the main opinion herein, testimony was given by defendant to the effect that, immediately preceding the shooting, in a conversation or "quarrel" which he had had with the woman whom he thereafter killed, at a moment when she was in front of a cupboard, she "wheeled around with a knife in her hand and said 'I'll give it to you; I'll fix you!'"; that defendant "then jumped back to the door and said 'Don't come over here!' But she kept coming."

In the case of *People* v. *Wilson*, 29 Cal. App. 563 [156 Pac. 377], the facts were not nearly so strong in the defendant's favor as were those in the instant case with respect to the defense of this defendant, and yet it was ruled not only that the defendant was entitled to have given to the jury an instruction by which the crime of manslaughter would be defined, but also that the failure of the trial court to give such an instruction to the jury constituted prejudicial error;—and solely for those reasons the judgment was reversed.

In the case of *People* v. *Hayes*, 9 Cal. App. 301, 305 [99 Pac. 386], the court said: "The case of *Stevenson* v. *United States*, 162 U. S. 313 [16 Sup. Ct. 839, 40 L. Ed. 980], is a case in its essential particulars similar to the case at bar. In the Stevenson case the judgment was reversed solely for the reason that the trial court refused to submit to the jury the issue of manslaughter. The language of the court, speaking through Justice Peckham, is exceedingly appropriate to the

matter before us. It was there said: 'The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; so long as there is *some* evidence upon the subject, *the proper weight to be given it is for the jury to determine.* If there were *any evidence* which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true, and whether it showed that the crime was manslaughter instead of murder. . . . The evidence *might appear to the court to be simply overwhelming* to show that the killing was in fact murder, and not manslaughter or an act performed in self-defense, and yet, so long as there was *some* evidence relevant to the issue of manslaughter, the credibility and force of such evidence *must be for the jury,* and cannot be matter of law for the decision of the court.' " (Emphasis added.) See, also, *People* v. *Logan,* 175 Cal. 45, 50 [164 Pac. 1121]. The court also ruled in the Hayes case (syllabus) that "No matter how conflicting the evidence, if there is any evidence tending to show that the crime might be manslaughter, it is the duty of the court to submit the question to the jury for its decision."

Also, it was declared in the case of *People* v. *Manzo,* 9 Cal. (2d) 594, 598 [72 Pac. (2d) 119], that "If there was sufficient evidence in the case upon which the jury might have returned a verdict of manslaughter, an instruction defining it should have been given, . . . " To the same effect, see: *People* v. *Wilson,* 29 Cal. App. 563 [156 Pac. 377]; *People* v. *Hayes,* 9 Cal. App. 301 [99 Pac. 386]; *People* v. *Sidelinger,* 9 Cal. App. 298 [99 Pac. 390]; *People* v. *Darrow,* 212 Cal. 167 [298 Pac. 1]; *People* v. *Best,* 13 Cal. App. (2d) 606 [57 Pac. (2d) 168].

In the instant case it may be noted that in the prevailing opinion it is stated that "The jury was correctly and properly instructed respecting the degrees of murder, and of their power to fix the punishment in case it found the defendant guilty of murder in the first degree. With these instructions before them, they found the appellant guilty of murder in the first degree without recommending life imprisonment. If under the evidence and these instructions, the jury rendered a verdict calling for the death penalty, it is not rea-

sonable to suppose that their verdict would have been different had the proposed instruction on manslaughter been given.''

An examination of the transcript of the proceedings that occurred in the trial court reveals the fact that in the instructions which were given to the jury relative to the crimes of first and second degree murder and the law of self-defense, more than 2,000 words were employed; yet no instruction whatsoever was given to the jury by the trial court regarding the crime of manslaughter. It was not even mentioned. In the instant case, it is clear that, irrespective of evidence to the contrary, the jury was entitled to believe as true the facts as testified to by defendant,—which testimony was susceptible of the inference either that he was acting in self-defense, or that the shooting occurred ''upon a sudden quarrel or heat of passion''. It is not unreasonable to infer that the colloquy which assertedly had occurred between defendant and the woman whom he killed amounted to a ''sudden quarrel'' which engendered a ''heat of passion''; and if, from a consideration of the evidence, the jury believed that either of such conditions was the cause of the shooting,— under the provisions of section 192 of the Penal Code, had the jury been properly instructed as to the law thereon—it would have been fully authorized to return a verdict of ''guilty of manslaughter''. In such circumstances, defendant was entitled to have the jury apprised of the law concerning the offense of manslaughter in accordance with the instruction which he had offered, but which instruction the trial court refused to give. Indeed, the authorities are numerous to the effect that, in such circumstances, it became the duty of the trial court, of its own motion, to give to the jury such an instruction. See *People* v. *Heddens*, 12 Cal. App. (2d) 245, 247 [55 Pac. (2d) 230], where it was said: ''It is the duty of the court in criminal cases to give *of its own motion* instructions on the general principles of law pertinent to such cases, even *though they are not proposed* or presented in writing *by the parties themselves*. (*People* v. *Scofield*, 203 Cal. 703 [265 Pac. 914]; *People* v. *Bill*, 140 Cal.. App. 389 [35 Pac. (2d) 645]; *People* v. *Peck*, 43 Cal. App. 638 [185 Pac. 881]; *People* v. *Wagner*, 65 Cal. App. 704 [225 Pac. 464].)'' (Emphasis added.) Likewise, in the case of *People* v. *Manzo*, 9 Cal. (2d) 594, 598 [72 Pac. (2d) 119],

it was said that "In the trial of criminal cases it is the duty of the judge to instruct the jury on all of the general principles of law pertinent to the case. (*People* v. *Scofield,* 203 Cal. 703 [265 Pac. 914] . . . )". And in the case entitled *People* v. *Best,* 13 Cal. App. (2d) 606, 611 [57 Pac. (2d) 168], the rule again was reiterated, that "It is the duty of the court in a criminal case to give, *of its own motion,* instructions on the general principles of law pertinent to such cases, [even] where they are not proposed or presented in writing by the parties themselves. (8 Cal. Jur., p. 309.)" (Emphasis added.) To the same effect, see, also, *People* v. *Curran,* 24 Cal. App. (2d) 673 [75 Pac. (2d) 1090].

In the case entitled *People* v. *Darrow,* 212 Cal. 167, 184, 185 [298 Pac. 1], the source of this mandate as to the duty of the trial court was pointed out, as follows:

"Section 1127 of the Penal Code makes it the duty of the court to state to the jury all matters of law necessary for their information . . . Section 1159 of the Penal Code further provides that 'The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged.' This court . . . said in *People* v. *Wright,* 167 Cal. 1 [138 Pac. 349] . . . 'It is not the "theory" which the prosecution advances, nor the "theory" which the defense adopts which governs the court in the giving or in the refusing to give instructions. Theories are of moment in a criminal case only as they are supported by substantial evidence. What the trial court is commanded by law to do is to state to the jury all matters of law necessary for their information in their deliberations . . . ' "

Likewise, it is well established that the presentation by the defendant of a "self-defense" plea does not preclude the rendition of a verdict of "guilty of manslaughter". In other words, although the evidence that is presented may be of such a character that a plea of "self-defense" might not avail the defendant as a basis for an *acquittal,*—nevertheless, from a consideration of the same facts, the defendant might be entitled to a verdict of "guilty of manslaughter". In that regard, in the case of *People* v. *Hayes,* 9 Cal. App. 301, 306 [99 Pac. 386], the court said: "The trial court seems to have been of the opinion that the evidence showed, either an unlawful killing with malice aforethought, or a killing in neces-

sary self-defense. This was also the position of the trial court in the Stevenson case, *supra*, and upon this subject it was said: 'The ruling of the learned judge was to the effect that, in this case, the killing was either murder, or else it was done in the course of self-defense, and that under no view which could possibly be taken of the evidence would the jury be at liberty to find the defendant guilty of manslaughter. The court passed upon the strength, credibility and tendency of the evidence, and decided as a matter of law what it seems to us would generally be regarded as a question of fact, *viz.*, whether, under all the circumstances which the jury might, from the evidence, find existed in the case, the defendant was guilty of murder, or whether he killed the deceased, not in self-defense, but unlawfully and unjustly, although without malice. The presence or absence of malice would be the material consideration in the case, provided the jury should reject the theory of self-defense, . . . ' "

To the same effect is the ruling in the case entitled *People* v. *Best,* 13 Cal. App. (2d) 606, 609 [57 Pac. (2d) 168], where it was said: "The court instructed the jury that the crime of manslaughter was included in the charge of murder. A form of a verdict of manslaughter was handed to the jury upon their retirement, together with the usual forms in a murder trial. The court, however, failed to instruct the jury as to the definition of manslaughter, or as to what facts must be found by them before they could convict of the lesser offense. At the trial the defendant relied upon the plea of self-defense. This is indicated not only by the evidence offered by him, but also by the instructions which he submitted. His brief upon this appeal, as well as the oral argument of his counsel, show clearly that the case was tried on the theory that the crime of manslaughter was not involved." The court then said that although self-defense (where it is established) excuses, rather than fixes the degree of the homicide, and entitles defendant to an acquittal, nevertheless "the evidence and the inferences reasonably to be drawn therefrom may be sufficient to warrant the jury in concluding that, *though the killing was not justifiable under a plea of self-defense, it was done under such circumstances as to reduce the offense to voluntary manslaughter.* If malice is lacking and the mortal blow is struck in the heat of passion, excited

by a quarrel, sudden, and of sufficient violence to amount to adequate provocation, the offense is reduced to manslaughter. (*People* v. *Freel,* 48 Cal. 436.)'' (Emphasis added.)

From a consideration of the prevailing opinion herein, the question immediately is suggested as to whether, in a case such as here is presented, it is the law that it would be unnecessary to give any instruction regarding the crime of manslaughter, where, as here, the jury was fully instructed respecting first and second degree murder; also as to the power of the jury to fix the punishment in case it found defendant guilty of murder in the first degree;—and where, under the evidence shown to have been adduced, the jury thereupon returned its verdict of ''guilty of murder in the first degree,'' without recommendation as to what punishment should be imposed. If so, by the same token, in the instant case, had the trial court instructed the jury as to first degree murder only, and a verdict identical with that herein had been returned, it should follow that defendant would not have been prejudiced by reason of the fact that no instruction had been given respecting second degree murder. In other words, is it possible that, in the happening of such event, it properly might be declared the defendant had not been prejudicially affected by the failure of the trial court to instruct the jury regarding the law pertaining to second degree murder, because, in effect, by its verdict the jury had determined that the death penalty should be imposed?

Again referring to the transcript of the proceedings had in the trial court regarding the fact that the trial court employed 2,000 words or more in defining the crime of murder, and in telling the jury in detail about the various ramifications of the law regarding the same,—does it seem reasonable to presume that had even a small percentage of those 2,000 words been dedicated to the purpose of informing the jury relative to its right under the circumstances to convict the defendant of the crime of manslaughter, the result would have been identical with that which was reached in the absence of such information? Otherwise stated,—in the light of the evidence herein adduced,—may it confidently be declared as the law of this state that because the jury, in effect, recommended the ''death'' penalty, and thereby precluded the imposition of any lesser punishment, the giving of in-

structions regarding lesser offenses than that of first degree murder would be rendered unnecessary as far as the rights of defendant were concerned? If that question may not be answered affirmatively with respect to the crime of second degree murder, no sufficient reason is readily discernible for failing to give instructions regarding the crime of manslaughter, where evidence supporting such offense is adduced. In my opinion, the law concerning the question herein being considered is ably and aptly expressed in the very recent decision entitled *Kinard* v. *United States,* 96 Fed. (2d) 522, 524 [68 App. D. C. 250], wherein the court said:

" 'In a criminal case a court should instruct on all essential questions of law involved in the case, whether requested or not. *People* v. *Odell,* 230 N. Y. 481 [130 N. E. 619]; *Commonwealth* v. *Ferko,* 269 Pa. 39 [112 Atl. 38]; *Pearson* v. *State,* 143 Tenn. 385 [226 S. W. 538]; *Duroff* v. *Commonwealth,* 192 Ky. 31 [232 S. W. 47]; *State* v. *Lackey,* 230 Mo. 707 [132 S. W. 602]. . . . ' It is further assigned as error that the trial court, in its charge, instructed the jury concerning manslaughter as follows: 'This indictment which charges the defendant with murder in the first degree carries the charge of what we call the included offenses. The included offenses of murder in the first degree are murder in the second degree and manslaughter. But you are told that in the judgment of the Court the facts as revealed in the evidence in this case are not of such a nature and character as to sustain a verdict of manslaughter, and therefore you are instructed that your verdict, which will come at the end of the case, will be either guilty of murder in the first degree, or guilty of murder in the second degree, or not guilty.' . . . It is true that defendant's testimony was sharply contradicted. It is arguable that the evidence was overwhelmingly indicative of murder rather than manslaughter. But 'hat is beside the point so far as concerns the propriety of the instruction given. It was not the duty of the trial court to weigh the evidence and determine whether the defendant was guilty of murder or manslaughter, but merely to determine the preliminary question of law—whether there was such a complete absence of evidence upon the issue of manslaughter as to require that it be taken from the consideration of the jury. The applicable rule has been stated by the Supreme Court in *Stevenson*

v. *United States*, 162 U. S. 313, 323 [16 Sup. Ct. 839, 843, 40 L. Ed. 980], as follows: 'A judge may be entirely satisfied from the whole evidence in the case that the person doing the killing was actuated by malice; that he was not in any such passion as to lower the grade of the crime from murder to manslaughter by reason of any absence of malice; and yet if there be *any evidence fairly tending to bear upon* the issue of manslaughter, it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime was murder or manslaughter.' (Italics supplied.)  In the same case, 162 U. S. 313, at page 314 [16 Sup. Ct. 839, 40 L. Ed. 980], the court stated the rule again, in the following language: 'The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question.  So long as there is *some evidence* upon the subject, the proper weight to be given it is for the jury to determine. If there were *any evidence* which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true and whether it showed that the crime was manslaughter instead of murder.' (Italics supplied.)  The only situation, then, in which an instruction taking the issue of manslaughter from the jury is proper, is one in which, as ruled in the Stevenson Case, there is no 'evidence relevant to the issue of manslaughter' or no 'evidence fairly tending to bear upon the issue of manslaughter'. . . . . . . The fact that in the present case there was other evidence highly persuasive of guilt of murder does not affect the applicability of the rule stated.  As the court said in *Stevenson* v. *United States, supra,* 162 U. S. 313, at page 315 [16 Sup. Ct. 839, 40 L. Ed. 980]: 'The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self-defense, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court.' [See footnote where it was said: ''This rule has been followed by the state courts.  See *People* v. *Colantone*, 243 N. Y. 134, 152 N. E. 700; *Lewis* v. *State*, 89 Tex. Cr. R. 345, 231 S. W. 113; *Mason* v. *Commonwealth*, 209 Ky. 157, 272 S. W.

397.''] The government contends, in support of the instruction given by the trial court, that the facts in the present case are susceptible of but two possible interpretations: One, that the appellant was not guilty because he acted in self-defense; the other, that he was guilty of murder in the first or second degree, hence, that a killing upon provocation in a heat of passion is necessarily inconsistent with the facts. Although such a conclusion properly follows where a defendant urges, in the alternative, killing upon provocation in a heat of passion and accidental killing (*Bell* v. *United States, supra*), 47 Fed. (2d) 438 [60 App. D. C. 76, 74 A. L. R. 1098], it does not follow where he urges, in the alternative, killing upon provocation in a heat of passion and self-defense. The two, in the latter alternative, are not mutually exclusive and inconsistent. *Stevenson* v. *United States, supra,* 162 U. S. 313, at page 322 [16 Sup. Ct. 839, 40 L. Ed. 980]. Provocation sufficient to produce a heat of passion and a resulting absence of malice may give such character to a homicide as to make it manslaughter; the same provocation may, under slightly varied circumstances, justify a person in killing in self-defense. *Wallace* v. *United States,* 162 U. S. 466 [16 Sup. Ct. 859, 40 L. Ed. 1039]. Heat of passion may be produced by fear as well as by rage (*Stevenson* v. *United States, supra,* 162 U. S. 313, at page 320 [16 Sup. Ct. 839, 40 L. Ed. 980]) and, if the provocation therefor is adequate (*Jackson* v. *United States,* 48 App. D. C. 272), the resulting killing may be manslaughter. The essence of the self-defense situation is a reasonable and *bona fide* belief of the imminence of death or great bodily harm. *Brown* v. *United States,* 256 U. S. 335, 343 [41 Sup. Ct. 501, 502, 65 L. Ed. 961, 18 A. L. R. 1276]. Heat of passion may or may not be present. *It is the function of the jury, under proper instructions, to determine whether either defense is available to the accused under the circumstances of the particular case.* [See footnote where it was said: ''See *State* v. *Kidd,* 24 N. M. 572, 175 Pac. 772; *Tucker* v. *Commonwealth,* 159 Va. 1038, 167 S. E. 253. The defendant is entitled to an instruction on the law of manslaughter although he relies solely upon the theory of self-defense. *State* v. *Greenlee,* 33 N. M. 449, 269 Pac. 331; *State* v. *Rish,* 104 S. C. 250, 88 S. E. 531; *Commonwealth* v. *Colandro,* 231 Pa. 343, 80 Atl. 571.] We are satisfied that

there was some evidence in the present case tending to show that the killing occurred while appellant was in a heat of passion provoked by the actions of his wife, the deceased; and, consequently, that the trial court, in giving the portion of the charge complained of, invaded the province of the jury. Although no exception was taken by appellant to the charge when it was given, it is our duty, nevertheless, as an appellate court, to correct any error prejudicial to him, especially in a capital case, or other case where the crime charged is of serious character. *Patten* v. *United States*, 42 App. D. C. 239, 247; *Wiborg* v. *United States*, 163 U. S. 632, 658 [16 Sup. Ct. 1127, 1197, 41 L. Ed. 289]; *Meadows* v. *United States*, 82 Fed. (2d) 881 [65 App. D. C. 275]. See, also, *Crawford* v. *United States*, 212 U. S. 183, 194 [29 Sup. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392]. It is the imperative duty of the court to see that a defendant *has a fair trial* 'no matter how severe may be the condemnation which is due to the conduct of a party charged with a criminal offense, . . . Only *in the exact administration of the law* will justice in the long run be done, and the confidence of the public in such administration be maintained.' *Clyatt* v. *United States*, 197 U. S. 207, 222 [25 Sup. Ct. 429, 433, 49 L. Ed. 726]." (Emphasis added.)

As hereinbefore has been indicated, in the instant case the jury was elaborately instructed with respect to the crime of murder in the first and second degrees. No complaint in that regard has been made by appellant. But by no instruction was the crime of manslaughter defined or any anywise mentioned. As far as the instructions that were given were concerned, the jury had no knowledge or information as to the existence of such a crime; neither did it know—nor was it informed—that, even if in its opinion the evidence adduced on behalf of the "self-defense" theory was insufficient to justify an "acquittal", nevertheless, it might return a verdict of "guilty of manslaughter." The verdict which was returned contains no certain indication that, had the jury been as elaborately and emphatically instructed with reference to the crime of manslaughter as it was relating to the crime of murder, the verdict would not have been at least more favorable to defendant than was the one which was returned.

To my mind the error was most prejudicial to the rights of defendant.

Rehearing denied.